456 S.E.2d 459

STATE of West Virginia, Plaintiff Below, Appellee,

v.

Doug JONES, Defendant Below, Appellant.

No. 22377.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 18, 1995.

Decided March 6, 1995.

---

Mary Beth Kershner, Asst. Pros. Atty., Charleston, for appellee.

Nelson R. Bickley, Bickley & Jacobs, Charles R. Webb, Pepper & Nason, Charleston, for appellant.

CLECKLEY, Justice:

The appellant and defendant below, Doug Jones, was convicted in May, 1993, by a jury in the Circuit Court of Kanawha County of the crime of principal in the second degree to first degree murder for the death of Frankie Stafford. He was sentenced to life in prison and received a recommendation of mercy. On appeal to this Court, he assigns as error the delay in presenting him before a magistrate and the reliability of a confession admitted into evidence, which he claims he never made. After reviewing the record, we find the defendant's rights under the Fourth Amendment to the United States Constitution and Article 3, § 6 of the West Virginia Constitution were violated when he was transported involuntarily to the police station and detained for interrogation and was not "expressly informed that he [was] not under arrest, ... [was] not obligated to answer questions and [was] free to go." *State v. Mays,* 172 W.Va. 486, 489, 307 S.E.2d 655, 658 (1983). Accordingly, we reverse his conviction.

## I.

## BACKGROUND

On March 4, 1991, the defendant and John Boyce met in the afternoon and began drinking beer at a bar in Kanawha City. They picked up Frankie Stafford to join them around 2:00 p.m. Throughout the day the men drove around in Mr. Boyce's car and consumed a large quantity of beer. They went to a baseball park at Kanawha State Forest and drank a half gallon of vodka. At approximately 9:00 p.m., they drove to the home of Pamela Parsons. Upon their arrival at her home, it was obvious to Ms. Parsons that the men had been drinking.

The trio left Ms. Parsons's home and drove toward Davis Creek. An argument broke out, and the men climbed out of the car. The record evidence is conflicting as to what occurred next; however, it is clear that Mr. Stafford was beaten with a tire iron and thrown in the trunk of the car. The defendant believed Mr. Stafford was dead.

Mr. Boyce and the defendant returned to the home of Ms. Parsons around 1:00 p.m. and washed the blood from their hands. She was unaware of what had occurred and believed the men were covered with red clay. She gave them a wash cloth to clean the steering wheel of the car. Mr. Stafford regained consciousness and Ms. Parsons testified she could hear him yelling from the trunk. However, she believed they were playing a practical joke on Mr. Stafford and did not question what she heard.

Mr. Boyce and the defendant drove to Kirby Hollow in the Kanawha State Forest area. When the car became stuck in the mud, they let Mr. Stafford out of the trunk of the car. The men began fighting again. Mr.

Boyce became enraged when Mr. Stafford would not walk to get help. Mr. Boyce removed the shoe laces from his sneakers and strangled Mr. Stafford. They rolled Mr. Stafford's body down a hill and wrapped it in a carpet.

The defendant and Mr. Boyce walked to get help so that the car could be pulled from the mud. They went to Randy Hubbard's house, but he was unable to pull the car out with his car. They went to Mark Baire's house and waited in his truck for awhile. The defendant later walked home. When Mr. Baire came out early the next day, he pulled the car out of the mud. Mr. Boyce confessed to Mr. Baire that he strangled Mr. Stafford.[1]

The police began an investigation after receiving the following leads: a large amount of blood was reported on the road where the murder occurred, along with a tire iron and what appeared to be human hair; a missing person's report was filed for Mr. Stafford; Mr. Baire gave a statement to the police; and it was learned that Mr. Stafford was last in the company of Mr. Boyce and the defendant.

On March 7, 1991, at approximately 7:00 p.m., Trooper J.W. Gundy went to the defendant's home and asked if the defendant would answer some questions. The defendant voluntarily went with Trooper Gundy, and they talked in the patrol car. The defendant was not informed of his *Miranda* rights.[2] He stated that he had been drinking with Mr. Boyce and Mr. Stafford and that he could only remember waking up at the baseball field. He denied any knowledge of the whereabouts of Mr. Stafford.

Trooper Gundy asked the defendant to show him where Mr. Boyce lived. They drove to the house and spoke with Mr.

Boyce's sister, Jeannie Morris. They walked up a pipeline right-of-way behind the house to where the car was stuck in the mud. At the top of the hill, they met with Sergeant Gordon Clark who had arrived on the scene earlier with Trooper Hutchinson to look for a body where the blood and tire iron were found. Sergeant Clark advised the defendant of his *Miranda* rights and began questioning him as to the whereabouts of Mr. Stafford.[3] The defendant insisted he knew nothing and reiterated the version of the events he gave to Trooper Gundy.

Sergeant Clark transported the defendant to the police station and left him sitting in the waiting area of the station. Trooper G.K. Barnette arrived at the station at approximately 11:00 p.m. and recognized that the defendant was very upset. He asked the defendant if he was alright and if he would like to follow him. The defendant went with him to the back of the secretary's room at the station. He was not given *Miranda* warnings at the police station. Trooper Barnette asked the defendant if he wanted to talk about what happened. The defendant broke down, began crying, and admitted he hit Mr. Stafford with the tire iron a couple of times when the men were fighting. He stated that he helped Mr. Boyce place the victim in the trunk. The defendant also admitted that he held Mr. Stafford when Mr. Boyce choked him.

## II.

## DISCUSSION

On appeal, the defendant requests we find his stationhouse confession inadmissible because of the unjustified delay in presenting him to a magistrate. He contends that probable cause to arrest existed when he was

---

1. Mr. Boyce stayed at his mother's house for three days. When he heard the police had picked up the defendant, he fled the State. Two weeks later, he was apprehended in Brownsville, Texas. On March 21, 1991, Mr. Boyce gave a statement to Trooper J.W. Gundy of the West Virginia State Police at the Texarkana Jail.

2. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. Obviously, there is a serious question whether *Miranda* rights were necessary at this point. First, as will be discussed in note 10, *infra,* the State admitted the defendant had been taken into custody at this point. Second, as *Miranda* warnings are necessary only prior to custodial interrogation, the issuance of *Miranda* warnings may transform a legal *Terry* stop into an illegal arrest. *See State v. Farley,* 192 W.Va. 247, 254 n. 10, 452 S.E.2d 50, 57 n. 10 (1994); *United States v. Obasa,* 15 F.3d 603 (6th Cir.1994).

picked up by the police at 7:00 p.m. To support his claim that the police had probable cause, the defendant contends the police knew that Mr. Stafford was missing, that he was last seen in the company of the defendant and Mr. Boyce, and that Mr. Baire reported that Mr. Boyce confessed to the murder.[4] He argues the reason the police did not immediately make a formal arrest and take him before a magistrate was because they were trying to secure a confession, a practice condemned in *State v. Humphrey*, 177 W.Va. 264, 351 S.E.2d 613 (1986).

■ At the suppression hearing, the State asserted, and the circuit court agreed, that until the defendant confessed and/or the body of Mr. Stafford was discovered, there was no probable cause to arrest. Because we also believe the police lacked probable cause to arrest when the defendant was being questioned by the officers, we find the prompt presentment rule was not triggered.[5]

■ However, these facts raise the far more significant question of whether the police violated the defendant's rights under Section 6 of Article III of the West Virginia Constitution [6] when, without probable cause, he was taken into custody and transported to the police station for interrogation without his consent.[7] Clearly, the police cannot seize an individual, take him involuntarily to a police station, and detain him for interrogation purposes while lacking probable cause to make an arrest. *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). In Syllabus Point 1, in part, of *State*

---

4. The defendant also argues that at this time the police obtained Ms. Parsons' statement. However, it appears from the record that Ms. Parsons contacted the police after watching televised footage of the defendant's arrest.

5. We reject the notion that a violation of the prompt present rule may be based on illegal custodial detention alone. Rather, we believe that a *de facto* arrest is sufficient to invoke the prompt presentment rule when the defendant is taken into custody and there is probable cause justifying an arrest. Our prior cases support this view. Syllabus Point 3 of *State v. Wickline*, 184 W.Va. 12, 399 S.E.2d 42 (1990), states:

 " 'Our prompt presentment rule contained in W.Va.Code, 62–1–5, and Rule 5(a) of the West Virginia Rules of Criminal Procedure, is triggered when an accused is placed under arrest. Furthermore, once a defendant is in police custody with sufficient probable cause to warrant an arrest, the prompt presentment rule is also triggered.' Syllabus Point 2, *State v. Humphrey*, 177 W.Va. 264, 351 S.E.2d 613 (1986)."

6. This Court has traditionally interpreted this section in harmony with federal case law construing the Fourth Amendment to the United States Constitution. *State v. Duvernoy*, 156 W.Va. 578, 195 S.E.2d 631 (1973).

7. The defendant raises the issue of whether the police were required to give *Miranda* warnings before he was interrogated at the police station. After the police had brought the defendant to the police detachment, he was left in the waiting area of the detachment for approximately one hour when he was observed to be "real upset" by Trooper G.K. Barnette. The officer interrogated the defendant without giving *Miranda* warnings because Trooper Barnette had been told that other officers had given the *Miranda* warnings at

the crime scene three hours earlier. We agree with the defendant that this case possibly could be decided on the failure to give the basic *Miranda* warnings once he was interrogated at the detachment. Under *Miranda*, police must advise a suspect of his right to remain silent and his right to counsel before each custodial interrogation. The issue here is whether the initial warnings became so stale due to the intervening circumstances that the subsequent interrogation at the detachment must be considered separate and distinct. In deciding whether the prior warnings are stale, the North Carolina Supreme Court held:

 "[W]here no inordinate time elapses between the interrogations, the subject matter of the questioning remains the same, and there is no evidence that in the interval between the two interrogations anything occurred to dilute the first warning, repetition of the warnings is not required." *State v. McZorn*, 288 N.C. 417, 433, 219 S.E.2d 201, 212 (1975).

Several courts, including *McZorn*, have suggested the following factors should be considered in making this determination: (1) the length of time between the giving of the first warnings and the subsequent interrogation; (2) whether the warnings and the subsequent interrogation were given in the same or different places; (3) whether the warnings were given and the subsequent interrogation conducted by the same or different officers; (4) the extent to which the subsequent statement differed from any previous statements; and (5) the apparent intellectual and emotional state of the suspect. *See State v. Myers*, 345 A.2d 500 (Me.1975) (enumerated same factors as *McZorn*). Application of these factors favors the defendant's argument that *Miranda* warnings were necessary before the subsequent interrogation. We choose, however, to base the reversal in this case on the clearer illegal detention issue.

*v. Stanley,* 168 W.Va. 294, 284 S.E.2d 367 (1981), we state:

> "Where police, lacking probable cause to arrest, ask suspects to accompany them to police headquarters and then interrogate them ... during which time they are not free to leave or their liberty is restrained, the police have violated the Fourth Amendment."

With this in mind, we turn to the facts and law supporting the defendant's claim for reversal.

### A.

### *Illegal Detention Issue*

■ A fair reading of the record reveals the defendant voluntarily left his house and answered questions for Trooper Gundy in the police car. It is likewise fair to conclude the defendant volunteered to show Trooper Gundy the location of Mr. Boyce's home. While at the Boyce residence, the idea to walk over the right-of-way to the top of the hill originated with Ms. Morris. Based on this evidence, we find the defendant was not in custody or was otherwise detained when the group reached the top of the hill. However, the situation quickly changed.

When the defendant met Trooper Clark, he was advised of his *Miranda* rights and was interrogated.[8] He was then driven to the South Charleston Police Barracks. The defendant was not told he was free to leave, but instead was asked to sit in the waiting area of the detachment. More significantly, as admitted by the State and found by the trial court below, the police lacked probable cause to transport and hold the defendant for questioning at the police station.

Our cases recognize the limited nature of an investigative stop, commonly referred to as a "seizure," under *Terry v. State of Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *State v. Boswell,* 170 W.Va. 433, 438, 294 S.E.2d 287, 292 (1982), we state: "Because stopping a person involves less intrusion on the individual's privacy, the seizure's validity is ordinarily tested by less severe standards than the probable cause standard that is necessary to effect an arrest." In *Stanley,* we adopted *Dunaway* and held, unlike investigative stops, "detention for custodial interrogation" may not be based on reasonable suspicion alone. Rather, we suggested in *Stanley,* when the detention of a suspect goes beyond the narrowly prescribed scope of a *Terry* stop, the detention must be supported by probable cause.[9]

In *Dunaway,* the United States Supreme Court invalidated a New York law permitting custodial stationhouse detention and interrogation based on reasonable suspicion of involvement in the crime under investigation. The Supreme Court made it clear that under *Terry* the traditional Fourth Amendment requirements of probable cause and a search warrant are not necessary and, upon proper balancing of interests, limited stops could be made upon reasonable suspicion. However, the Supreme Court added that for any type of detention more intrusive than a *Terry* stop, the "requisite balancing has been performed in centuries of precedent and is embodied in the principle that seizures are reasonable only if supported by probable cause." 442 U.S. at 213, 99 S.Ct. at 2257, 60 L.Ed.2d at 837. The rule in *Dunaway* was reaffirmed in *Florida v. Royer,* 460 U.S. 491, 499, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229, 237 (1983),

---

**8.** The defendant raises the fact that Trooper Hutchinson testified that when the defendant was questioned on the top of the hill, he believed the defendant was in custody. In resolving the custody issue, this Court does not consider as dispositive Trooper Hutchinson's subjective views that were not communicated to the defendant. The United States Supreme Court states in *Stansbury v. California,* — U.S. —, —, 114 S.Ct. 1526, 1530, 128 L.Ed.2d 293, 300 (1994):

> "[A]n officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that

bear upon the assessment whether that individual was in custody, but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave."

**9.** *See* George E. Dix, *Nonarrest Investigatory Detentions in Search and Seizure Law* 1985 Duke L.J. 849, 942 (1985) (unlike a typical custodial interrogation, in which a party may face a wide-ranging barrage of questions with no prospect of relief, a *Terry* inquiry must be pointed and brief).

when the Supreme Court stated "reasonable suspicion of crime is insufficient to justify custodial interrogation even though the interrogation is investigative."

The demarcating line between "investigative stops" not requiring probable cause and detentions for which probable cause is required is indistinct.[10] The Supreme Court said in *Royer*:

"The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." 460 U.S. at 500, 103 S.Ct. at 1325, 75 L.Ed.2d at 238.

■ There are several factors, however, we find significant in shedding light on the point at which a stop is converted into an "arrest."[11] First, *Dunaway* referred to the detention permitted under *Terry* as being a brief "momentary" encounter which is designed to clarify an ambiguous situation, and not an occasion for a lengthy investigation to develop probable cause. As stated in *Royer*: "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." 460 U.S. at 500, 103 S.Ct. at 1325, 75 L.Ed.2d at 237. In *United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), the Supreme Court refused to adopt a twenty minute *per se* rule for an investigative stop.[12] The Supreme Court instead adhered to the reasonableness standard to evaluate such conduct. Reasonableness depends on " 'whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.' " 470 U.S. at 681, 105 S.Ct. at 1573, 84 L.Ed.2d at 613, *quoting Terry*, 392 U.S. at 20, 88 S.Ct. at 1879, 20 L.Ed.2d at 905.

The facts of this case are not clear as to why it was necessary to detain the defendant

10. The discussion regarding custodial detention is largely academic because the State has conceded and admitted the defendant was taken into custody and held for approximately three hours before he confessed to his involvement in the killing. In response to the trial court's questioning, Assistant Prosecuting Attorney Patrick O'Neal admitted that:

"[I]t does appear that when they got to the top of the hill [Kirby Holler], whatever Trooper Gundy's perception was, Sergeant Clark's perception, and Trooper Hutchison's perception, was that some sort of custody had developed, that this was just what the Miranda case talks about, custodial interrogation, and that is why the first thing that Sergeant Clark did was to pull the plastic card from his pocket and read the rights."

Later, in the same exchange, the trial court again revisited the issue of custody that occurred after the defendant had been transferred to the detachment:

"The Court: Now once again, for the record, Mr. O'Neal, the defendant, even though he has not been arrested—
"Mr. O'Neal: Is in custody.
"The Court: —is in custody. He is not free to leave.
"Mr. O'Neal: That's correct. Apparently that was the perception of at least most of the witnesses at that point.
"The Court: Well, I was wondering if that is the State's position, whether he was in custody down there. Is that your position? Are you admitting that he was, as the law defines custody, in custody?
"Mr. O'Neal: Your Honor, if he had gotten up and walked out the door, I don't know what would have happened. But I am certainly willing to say that at that point he believed he was in custody, and I believe that is the crucial thing.
"The Court: As far as the law is concerned in these situations, was he in custody.
"Mr. O'Neal: I believe so.
"The Court: Okay. All right, he was in custody."

11. The controlling factors are: (1) the length, duration, and purpose of the detention; (2) the extent and nature of the questioning of the suspect; (3) the location of the detention and interrogation; (4) whether the suspect was advised that he was free to leave and was not required to answer questions; and (5) the use of force or other physical restraints during the stop.

12. To aid in the determination of whether a stop has crossed the boundary and become the equivalent of an arrest, the "twenty minute" rule was proposed by the Model Code of Pre–Arraignment Procedure. "In evaluating whether an investigative detention is unreasonable," the Supreme Court in *Sharpe* cautioned that "common sense and ordinary human experience must govern over rigid criteria." 470 U.S. at 685, 105 S.Ct. at 1575, 84 L.Ed.2d at 615.

for the lengthy period he was held beginning at the crime scene and continuing at the police detachment for approximately three hours. We are particularly concerned that the police required the defendant to remain in the waiting area of the detachment for approximately one hour. "Prolonged detention will, at some point in time, be the practical equivalent of full arrest." *Franklin v. United States,* 382 A.2d 20, *modified on other grounds,* 392 A.2d 516 (D.C.1978), *cert. denied sub nom., Dickerson v. United States,* 440 U.S. 948, 99 S.Ct. 1428, 59 L.Ed.2d 637 (1979). Under these circumstances and considering our precedent discussed above, we cannot find that the police acted reasonably and diligently.[13]

Second, in *Dunaway,* the Supreme Court held that when police take a suspect to the stationhouse for interrogation, they must either have probable cause or the consent of the suspect. When a suspect is "taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room," this type of stationhouse questioning is a custodial equivalent to a formal arrest. 442 U.S. at 212, 99 S.Ct. at 2256, 60 L.Ed.2d at 836. The pivotal factor in *Dunaway,* as in the present case, is the transportation of the defendant to the police station without his consent.[14] Similarly, in *Royer,* the Supreme Court held that detaining and relocating a suspect to a private office were equivalent to an arrest. The

Supreme Court suggested that only safety or security would justify the relocation of a suspect during an investigative detention on less than probable cause.

The facts in the present case are indistinguishable from those in *Dunaway* and *Royer.* Indeed, the facts in both of these cases are far more favorable to the police than in the case *sub judice.* In *Dunaway,* the defendant was *Mirandized* after he was taken to the police station. Here, the *Miranda* rights were given before the "seizure" took place and were not later repeated at the detachment. In *Royer,* the suspect was taken only feet away to a private office. Here, the defendant was driven three miles from the crime scene to the detachment.[15]

■ Third, and perhaps most significant, in determining whether a *Terry* stop has converted into a custodial detention, courts should analyze the suspect's perception that he did not remain at liberty to disregard the police officer's request for information. In the present case, the defendant was never informed that he was free to leave the detachment. All the cases discussed above have focused on whether the police advised the defendant he was free to leave. Again, we begin with *Dunaway* where the Supreme Court emphasized that the defendant "was never informed that he was 'free to go.'"[16] 442 U.S. at 212, 99 S.Ct.

13. In *State v. Werner,* 117 N.M. 315, 318, 871 P.2d 971, 974 (1994), the Supreme Court of New Mexico suggested "common sense and ordinary human experience" as stated by *Sharpe* were relied upon to determine that a forty-five minute detention in the back of a locked patrol car constituted a *de facto* arrest. Parenthetically, the court observed that although placing the defendant in the back of a patrol car is not an arrest *per se,* after balancing the nature of the intrusion with the officers' justifications for the detention, the detention exceeded the limits of an investigative stop. The court found that the amount of time taken by the police was an important factor in the analysis:
"The concept of diligence has an aspect of speed or haste. As soon as the investigation requires awaiting the development of circumstances off the scene, the validity of the investigatory stop becomes suspect. If authorities, acting without probable cause, can seize a person, hold him in a locked police car for over forty-five minutes while gathering witnesses, and keep him available for arrest in

case probable cause is later developed, the requirement for probable cause for arrest has been turned upside down." 117 N.M. at 319, 871 P.2d at 975.

14. At oral argument, counsel for the defendant indicated the distance between the scene of the crime and the police detachment was about three miles. This fact was uncontested by the State.

15. *See also United States v. Parr,* 843 F.2d 1228 (9th Cir.1988) (although detention of suspect in police car for three-quarters of an hour as an investigative detention, not an arrest, was upheld, court pointed out there is no bright-line rule for determining when a stop turns into an arrest; most cases hold that the line is crossed when the suspect is transported to the police station).

16. The Court in *Dunaway* pointed out that once the suspect had been picked up and taken to the police station, "[h]e was never informed that he

at 2256, 60 L.Ed.2d at 836. In *Royer*, the Supreme Court stated: "Royer was never informed that he was free to board his plane if he so chose, and he reasonably believed that he was being detained.... As a practical matter, Royer was under arrest." 460 U.S. at 503, 103 S.Ct. at 1327, 75 L.Ed.2d at 240. In *Stanley*, this Court indicated that the police could avoid false claims of illegal detentions by "making it clear to those to whom they are about to interrogate that they are not under arrest and are free to leave." 168 W.Va. at 298, 284 S.E.2d at 370. Finally, in Syllabus Point 2 of *State v. Mays*, 172 W.Va. 486, 307 S.E.2d 655 (1983), we set forth the following bright-line rule:

"Limited police investigatory interrogations are allowable when the suspect is expressly informed that he is not under arrest, is not obligated to answer questions and is free to go."

In summary, if the police merely question a suspect on the street without detaining him against his will, Section 6 of Article III of the West Virginia Constitution is not implicated and no justification for the officer's conduct need be shown. At the point where a reasonable person believes he is being detained and is not free to leave, then a stop has occurred and Section 6 of Article III is triggered, requiring that the officer have reasonable suspicion that criminal activity is afoot. If the nature and duration of the detention arise to the level of a fullscale arrest or its equivalent, probable cause must be shown. Thus, the police cannot seize an individual, take him involuntarily to a police station, and detain him for interrogation purposes while lacking probable cause to make an arrest.[17]

Consequently, in *State v. Boswell, supra,* Justice Miller rejected Justice Stewart's definition from *Mendenhall* in favor of an approach based on the intensity of the encounter. Interestingly, Justice Miller also said in *Boswell* that a police/citizen encounter involving a criminal investigation procedure "must originate from some suspicious circumstance involving the defendant." 170 W.Va. at 440, 294 S.E.2d at 294. However, a year later in *State v. Mays, supra,* Justice Neely recognized the "no seizure" notion from *Florida v. Royer,* but then went on to adopt the "free to go" rule, i.e., "police investigatory interrogations without presentment to a magistrate are allowable only when the suspect is expressly informed that he is not under arrest, is not obligated to answer any questions and is free to go[.]" 172 W.Va. at 489, 307 S.E.2d at 658. What aroused this rule was that the defendant in *Mays*, like the present case, had been taken to police headquarters.

This decision seeks to clarify the law in West Virginia. By today's decision, we recognize the "no seizure" notion justifying *brief* police/citizen encounters irrespective of reasonable suspicion. Any further questioning, i.e., investigative interrogation, would have to be either justified by *Terry*-type suspicion or accompanied by the "free to go, etc." *Mays* warning, the latter ensuring the voluntariness of the encounter. Involuntary detention, like that which occurred in *Mays* and in this case, would amount to an arrest requiring probable cause and compliance with the prompt presentment standards.

Although it is not crucial to the outcome, it is important to clearly decipher when the defendant was first placed in custody. He was not in custody when he was in the company of Trooper Gundy, Sergeant Clark, and Trooper Hutchinson

---

was 'free to go'; indeed, he would have been physically restrained if he had refused to accompany the officers or had tried to escape their custody.... The mere facts that petitioner was not told he was under arrest, was not 'booked,' and would not have had an arrest record if the interrogation had proved fruitless, while not insignificant for all purposes, ... obviously do not make petitioner's seizure even roughly analogous" to a *Terry* stop. 442 U.S. at 212, 99 S.Ct. at 2256, 60 L.Ed.2d at 836. (Citation omitted). *See also Moore v. Ballone,* 658 F.2d 218 (4th Cir.1981) (the above language in *Dunaway* limited the expression in *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), that the lack of probable cause to arrest a suspect is always an indication that the stationhouse questioning is noncustodial).

17. The West Virginia law in this area is rather confounded. In a series of cases beginning with Justice Stewart's plurality opinion in *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), the United States Supreme Court developed the "no seizure" concept; the notion that it was permissible for an officer to approach a person, ask a few questions, ask for identification, and even ask for permission to search. Since this brief encounter did not amount to a seizure, no justification, i.e., reasonable suspicion, was necessary. *See Florida v. Royer, supra; Immigration & Naturalization Serv. v. Delgado,* 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984); *Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). In these cases, the Supreme Court defined a seizure as circumstances where a reasonable person would believe that he was not free to leave or free to decline to answer questions or otherwise terminate the encounter. Of course, the assumption in this definition carries its own refutation.

Based upon the foregoing discussion, we find the defendant was placed under "custodial detention" which legally can be done only if there is probable cause. We further find that under the objective standard reiterated in *Stansbury v. California*, a reasonable person in the defendant's situation would feel he was in custody.

Accordingly, we find the police violated the defendant's rights under Section 6 of Article III of the West Virginia Constitution by placing him in custody and transporting him to the police station when the State concedes the defendant was in custody and the police lacked probable cause to arrest.

## B.

### *Attenuation: Purging the Taint*

 We must next decide whether the causal connection between the lawless conduct of the police and the challenged evidence has become so attenuated as to dissipate the taint. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *State v. Canby*, 162 W.Va. 666, 252 S.E.2d 164 (1979). The attenuation doctrine was first announced by the Supreme Court in *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 267, 84 L.Ed. 307, 312 (1939): "[While] [s]ophisticated argument may prove a causal connection" between the unlawful detention and the confession, the circuit court, and later this Court, may determine "[a]s a matter of good sense ... [that] such connection may have become so attenuated as to dissipate the taint." In *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), the Supreme Court elaborated on the factors that must be considered in determining whether the taint has been

dissipated. These same factors were adopted by this Court in Syllabus Point 2 of *State v. Stanley*, 168 W.Va. 294, 284 S.E.2d 367 (1981), where we held:

> "A confession obtained by exploitation of an illegal arrest is inadmissible. The giving of *Miranda* warnings is not enough, by itself, to break the causal connection between an illegal arrest and the confession. In considering whether the confession is a result of the exploitation of an illegal arrest, the court should consider the temporal proximity of the arrest and confession; the presence or absence of intervening circumstances in addition to the *Miranda* warnings; and the purpose or flagrancy of the official misconduct."

No mathematical weight can be assigned to any of the factors we have discussed. No single factor is dispositive. Rather, a court must review the "totality of circumstances" to determine whether the taint has been sufficiently attenuated to permit the admission of the confession. In relying on the factors listed in *Stanley* and *Brown*, the Supreme Court in *Dunaway* discounted the significance of the *Miranda* warnings. Noting that the *Miranda* warnings satisfied the Fifth Amendment concerns, the Supreme Court stated that voluntariness was only the beginning threshold requirement for a Fourth Amendment analysis. The Supreme Court concluded by holding the *Miranda* warnings were relevant, but standing alone the *Miranda* warnings were insufficient to attenuate the taint. In all the cases— *Brown, Stanley* and *Dunaway*—the Supreme Court found the taint had not been attenuated.[18]

---

walking along the pipeline right-of-way. "The defendant voluntarily went with Trooper Gundy[.]" And this is true regardless of the subjective views of the officers. We find the defendant was placed in custody when he was involuntarily transported to the police detachment.

**18.** In *Taylor v. Alabama*, 457 U.S. 687, 690, 102 S.Ct. 2664, 2667, 73 L.Ed.2d 314, 321 (1982), involving a situation similar to the present case, the defendant was arrested without probable cause "in the hope that something would turn up." After being transported to the station and given *Miranda* rights, the defendant was finger-

printed and placed in a lineup. The police later told him that his fingerprint matched those obtained during the investigation of the crime. After consulting with his girlfriend, the defendant confessed. The Supreme Court virtually ignored the argument that there was a six-hour delay between the arrest and the confession, compared with a two-hour delay in *Brown* and *Dunaway*. "[A] difference of a few hours is not significant where, as here, petitioner was in police custody, unrepresented by counsel, and he was questioned on several occasions, fingerprinted, and subjected to a lineup." 457 U.S. at 691, 102 S.Ct. at 2667, 73 L.Ed.2d at 320.

We can find no evidence in the record to show the connection between the illegal "arrest" and the confession was sufficiently curtailed to permit the use at trial of the defendant's statement to Trooper Barnette. *See Stanley, supra.* Of particular importance is the temporal proximity between the detention and the confession. Approximately an hour after the defendant was transported to the detachment, he confessed. "Clearly, there was no break in the causal connection between the illegal ... [detention] and subsequent statement." *State v. Moore,* 165 W.Va. 837, 857, 272 S.E.2d 804, 817 (1980). Furthermore, we can find no other intervening circumstances sufficient to purge the taint. Therefore, under the attenuation analysis that we adopted in *Stanley,* we hold the statement was the product of illegal police detention, *i.e.,* custody without probable cause, and the admission of the defendant's statement into evidence was reversible error.[19]

### III.

### CONCLUSION

Based on the foregoing, the judgment of the Circuit Court of Kanawha County is reversed and this case is remanded for a new trial.

Reversed and remanded.

BROTHERTON, J., did not participate.

FOX, Judge, sitting by temporary assignment.

_____

**19.** We, therefore, decline to address the defendant's second assignment of error that the confession was unreliable.