461 S.E.2d 67

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Homer Eugene JAMESON, aka Jay Jameson, Defendant Below, Appellant.**

**No. 22685.**

Supreme Court of Appeals of West Virginia.

Submitted May 10, 1995.

Decided July 11, 1995.

Mary Beth Kershner, Asst. Pros. Atty., Charleston, WV, for appellee.

James M. Cagle, Charleston, WV, for appellant.

PER CURIAM:

The defendant in this proceeding, Homer Eugene Jameson, Jr., was sentenced to two consecutive life terms in the State penitentiary, with recommendations of mercy, for the felony murders of his wife's grandmother and grandfather, who died in an incendiary or set fire. On appeal, he claims that during his jury trial, the trial court erred in admitting into evidence a confession which he gave two days after the fire. He further argues that the statements in the confession were not corroborated by independent evidence offered by the State; that the trial court erroneously allowed two lay witnesses to express expert opinions during his trial; and that the indictment in his case was prejudicially rendered after the prosecutor delivered an unsupervised instruction on felony murder to the grand jury. After reviewing the issues presented and the record filed, we can find no reversible error. The judgment of the Circuit Court of Kanawha County is, therefore, affirmed.

At around 1:00 a.m. on February 9, 1993, a fire erupted in the St. Albans home of the defendant's wife's grandfather and grandmother, Riley and Opha Dawson. The Dawsons were overcome by smoke and died in the fire.

On the morning of the fire, various investigators from the West Virginia Fire Marshall's Office, the St. Albans Fire Department, and an insurance company all independently determined that the cause of the fire was arson, and officers Paul Ritchie, an Assistant State Fire Marshall, Criminal Enforcement Division, and Rick Fulmer of the St. Albans Fire Department, decided to question, among others, the defendant, who had been present, observing, while the fire was raging. Accordingly, officers Ritchie and Fulmer went to the defendant's apartment at approximately 11:30 p.m. on the night of February 10, 1993, and asked the defendant if he was interested in answering some questions about the fire. He was cooperative and agreed to accompany them to the St. Albans City Hall.

Shortly after the parties arrived at the St. Albans City Hall, at the suggestion of officers Ritchie and Fulmer, the defendant voluntarily went to a South Charleston State Police office, where he was given a polygraph test. Following the test, he was questioned at length by police officers.

At 6:33 a.m. on February 11, 1993, some seven hours after officers Ritchie and Fulmer contacted the defendant at his apartment, he gave the tape-recorded confession

in issue in the present case. In the confession he stated that he entered the house which burned, knowing that his wife's grandparents were sleeping upstairs, poured accelerant in the kitchen and den, and ignited it.

After the defendant gave his confession, a grand jury in Kanawha County indicted him for the felony murders of the Dawsons. The defendant was tried from October 4, 1993, until October 19, 1993. At the conclusion of the trial, the jury found him guilty of the felony murders and recommended that he receive mercy in conjunction with his sentences.

In the course of the defendant's trial, the State not only introduced evidence of the events which led to the arrest and conviction of the defendant, but also introduced the testimony of Joseph L. Dryden, who worked for INS Investigation Bureau, Inc., an organization that specialized in fire investigations. Mr. Dryden was qualified as an expert on the cause and origin of fires.[1] Mr. Dryden testified that, in his opinion, the fire which killed the Dawsons was an "incendiary" or set fire. He stated that there were very distinct liquid accelerant "pour patterns" on the floor of the Dawsons' house and such things as melted aluminum strips at the floor level. These facts, in his view, were consistent with an "incendiary" or set fire. The State, of course, also introduced the defendant's confession, the same having been ruled admissible after a lengthy *in camera* suppression hearing.

In the present appeal, the defendant's first assignment of error is that the trial court erred in admitting into evidence the tape recorded confession which he gave at 6:33 a.m. on February 11, 1993. The defendant's brief does not succinctly delineate the basis for this assignment of error, but it appears to this Court that he is arguing that he was interrogated after he was taken into custody in an illegal arrest and that he is a suggestible person of low intellect who, at the time of the giving of the confession, was under the influence of drugs. He also claims that the confession was extracted early in the morning after an all-night interrogation, during

which his interrogators made various misrepresentations of fact.

The record shows that during the *in camera* suppression hearing, the State adduced the testimony of four witnesses, and the defendant also called four witnesses. Additionally, the trial court viewed a videotape made of the defendant's remarks at the St. Albans City Hall and the audiotapes of the defendant's actual confession.

The first witness for the State was Paul Ritchie, from the Fire Marshall's Office, who testified that he informed the defendant of his *Miranda* rights at 11:35 p.m., approximately five minutes after he and Rick Fulmer went to the defendant's residence to inquire whether he was interested in answering some questions about the fire. He explicitly testified that the defendant was not placed under arrest or detained in any manner. Witness Ritchie also indicated that the defendant was cooperative and later agreed to take a polygraph test.

The second witness for the State, Rick Fulmer, of the St. Albans Fire Department, testified that he spoke briefly with the defendant at the fire scene and that he later accompanied Paul Ritchie to the defendant's residence on the night of February 10, 1993. His evidence relating to the contact with the defendant supported that of Paul Ritchie, except that he, unlike Paul Ritchie, indicated that the defendant was a suspect in the setting of the fire. He further indicated that at the St. Albans City Hall the defendant was again informed of his *Miranda* rights and that he signed a written waiver of those rights.

According to officer Fulmer, at the St. Albans interview the defendant denied any knowledge of the cause of the fire, and when he was asked if he would avail himself of an opportunity to prove his innocence, he said that he would, and he agreed to go to a South Charleston police center to take a polygraph test.

Mr. Fulmer testified that at the interview at the St. Albans City Hall, the defendant was not threatened, did not ask for a lawyer, and was free to leave. He also testified that

1. The defendant did not object to qualification of Mr. Dryden as an expert.

Paul Ritchie advised the defendant that he was free to leave.

Sergeant Steve Young, the third witness for the State, was a detective-polygraph operator who administered the polygraph test to the defendant at the South Charleston police center and who, with Sergeant Joe Crawford of the St. Albans Police Department, questioned the defendant after the polygraph test. Sergeant Young's testimony indicated that arrangements were made for the administration of a polygraph test to the defendant at around 7:30 or 8:00 p.m. on February 10, 1993, some four hours before Mr. Ritchie and Mr. Fulmer initially asked the defendant if he was interested in answering questions about the fire.

Sergeant Young testified that after administering and scoring the polygraph test, he concluded that the defendant was not telling the truth, and:

> I advised him that his polygraph examination showed that he had either set the fire, helped plan or arrange to set the fire, or knew for sure who did.

He proceeded to question the defendant and asked if he wanted to talk about the fire. Eventually, the defendant began confessing. According to Sergeant Young:

> ... Initially when he started confessing he said that he had set an electrical outlet on fire.... Crawford had advised him that the fire couldn't have been started that way and then the suspect told how he had spread an accelerant through there.

When the defendant admitted that he had started the fire with an accelerant, Sergeant Young again informed him of his *Miranda* rights. Only after this did Sergeant Young take the tape-recorded confession which the State sought to introduce into evidence.

Sergeant Young denied that the defendant was in any way coerced into giving the confession and also denied that the defendant at any point requested a lawyer. His testimony indicated that the defendant was actually arrested at 6:53 a.m. on February 11, 1993, only after he gave the confession.

The State's fourth witness, Sergeant Joe Crawford of the St. Albans Police Department, who was present during Sergeant Young's questioning of the defendant, indicated that the defendant was free to leave the police station at any time prior to his confession.

The defendant introduced evidence at the suppression hearing which indicated that he had been a special education student and inferred that he was a suggestible person with low intellectual functioning. The polygraph data sheet, which was presented at the suppression hearing, also showed that the defendant had consumed one beer and had taken a painkiller for a toothache on the night that he gave his confession.

■ The situation in the present case suggests that, at the time he gave his confession, the defendant was not under arrest, but was subjected to what this Court has termed a limited police investigatory interrogation. *See State of West Virginia v. Jones,* 193 W.Va. 378, 456 S.E.2d 459 (1995); *State v. Mays,* 172 W.Va. 486, 307 S.E.2d 655 (1983).

■ In *State v. Jones, supra,* the Court recognized that such limited police investigatory interrogations are allowable only under certain circumstances. In syllabus point 3, the Court stated:

> "Limited police investigatory interrogations are allowable when the suspect is expressly informed that he is not under arrest, is not obligated to answer questions and is free to go." Syllabus Point 2, *State v. Mays,* 172 W.Va. 486, 307 S.E.2d 655 (1983).

In the present case there was evidence that the defendant, prior to the time he gave his taped confession, was repeatedly and expressly informed that he was not under arrest and that he was free to go. There was also evidence that he was informed that he was not obligated to answer questions.[2]

---

2. The testimony of witness Paul Ritchie, which has previously been alluded to, was that the defendant was advised of his *Miranda* rights at 11:35 p.m., approximately five minutes after Ritchie and Rick Fulmer had arrived at the defendant's residence. That testimony proceeded as follows:

Q. At that time was he placed under arrest?
A. No.
Q. Was he detained in any manner?

In view of this testimony, the Court believes that, contrary to the defendant's contention, he was not under an illegal arrest at the time he gave his confession, but rather he was under an investigatory interrogation as discussed in *State v. Jones, supra.*

As to the voluntariness of the confession itself, the trial court made specific findings. The court said:

> The issue of the admissibility of State's Exhibit Number 1 is what needs to be ruled upon by me. And, for the record, I have not only heard what they have said, each and every witness, but I have watched each and every witness testify and observed the matters pertaining to their believability, credibility, and the weight of their evidence, including the demeanor and manner of testifying, the reasonableness and unreasonableness, if any, of their testimony, the hostility or friendliness or intelligence or lack of intelligence, their interest or lack of interest in the outcome of the case, and other factors regarding generally what you consider in determining credibility and weight to be given to a particular piece of testimony or evidence.

The court found:

> [N]o violations or infringements, as the law is deemed by me to exist, occurred regarding the taking or receipt of State's Exhibit 1 from Mr. Jameson. His rights, as guaranteed to him by the West Virginia Constitution, the United States Constitution, and the cases and/or statutes in West Virginia were not violated as a matter of fact and law, and I find that from a preponderance of the evidence I heard. Where conflicts in the evidence existed, or variances, between the testimony of witnesses, those conflicts, differences, or contradictions or whatever in terms—regarding credibility issues were resolved against ... Mr. Jameson.

After reviewing the evidence relating to the taking of the confession, this Court cannot conclude that it was involuntarily given by the defendant in violation of his rights. The defendant clearly was informed of his rights almost immediately after he was contacted by fire investigators Fulmer and Ritchie. He signed a written waiver of those rights. He was also later informed of his rights by Sergeant Young. There was no evidence that he was physically coerced into giving the confession. The defendant introduced evidence that he was a person of low intellectual functioning and, on appeal, suggests that he was led into falsely confessing. Although the testimony relating to his condition indicated that he had a low I.Q., that he did not have a long attention span, and that

> A. No.

Further, Paul Ritchie's testimony indicated that the defendant was free to go and that he was advised of that fact:

> Q. Was Mr. Jameson free to leave at any time?
> A. Yes.
> Q. To your knowledge, was he advised of this fact?
> A. Yes.
> Q. And who advised him?
> A. I did.
> Q. What exactly did you tell him with regard to that?
> A. This was at the beginning of it. He was advised he was not under arrest, that he was free to leave at any time.

Witness Ritchie further testified that the defendant was not arrested until approximately 6:30 a.m. on the next day.

On cross examination, witness Ritchie also said that he told the defendant that he was free to go as late as between 4:00 and 4:30 a.m. That cross examination also included the following:

> Q. But you say you honestly remember saying to Mr. Jameson, "You are free to go"?
> A. Yes, I did.
> Q. Okay. How was he going to get home?
> A. I would have taken him home.
> Q. You told him that?
> A. Yes.
> * * * * * *
> Q. ... I'm now down to 4:30. You are saying that you, Mr. Ritchie, told Jay Jameson, "You are free to go," or words to that effect, right?
> A. Correct. Yes.

Somewhat similarly, witness Richard Fulmer testified that when he was present during the interview of the defendant, the defendant was not under arrest and that prior to the interview the defendant was advised of his *Miranda* rights by Paul Ritchie. His testimony proceeded as follows:

> Q. Did you or anyone in your presence advise him that he was free to leave?
> A. Yes.
> Q. Do you recall who so advised him?
> A. Paul Ritchie did at one point.

his condition affected his ability to handle pressure when confronted with new material, the evidence did not show that the defendant was incapable of handling questioning or of rationally assessing his situation.

Also, while the evidence showed that the defendant was taking a painkiller and had had one beer, there was nothing to indicate that these circumstances negatively affected his mental functioning. The record does show that the trial court reviewed a videotape of the defendant made while he was involved in the investigatory interrogation which resulted in the confession, as well as audiotapes made in the same period.

In syllabus point 2 of *State v. Vance*, 162 W.Va. 467, 250 S.E.2d 146 (1978), this Court stated: "It is a well-established rule of appellate review in this state that a trial court has wide discretion in regard to the admissibility of confessions and ordinarily this discretion will not be disturbed on review." In syllabus point 3 of the same case, the Court said: "A trial court's decision regarding the voluntariness of a confession will not be disturbed unless it is plainly wrong or clearly against the weight of the evidence."

In this Court's view, the voluntariness determination, as well as the admissibility of the confession in the present case, required an assessment and judgment call by the trial court. The trial court, after rather clearly weighing the evidence, determined that its weight and preponderance supported admissibility. Given the evidence, this Court cannot conclude that the trial court's decision was plainly wrong or clearly against the weight of the evidence.

The Court notes that the defendant also claims that the confession was not corroborated by independent evidence.

The independent evidence introduced by the State showed that the defendant was at the scene of the fire at the time it was in progress and that he lived behind the house that burned. The State also called as expert witnesses, Joseph L. Dryden and Eugene Reed Cook, who testified that an accelerant

had been involved in the fire and who expressed the opinion that the fire had been deliberately set. This evidence establishing that the defendant was present at the location of the fire and that the fire was set by use of an accelerant, tended to corroborate the defendant's confession that he set the fire and that in so doing he used an accelerant.

The defendant's next assignment of error is that the circuit court committed prejudicial error when it permitted two lay witnesses to express their opinions as to the cause and origin of the fire.

Richard Fulmer, a member of the St. Albans Fire Department, whose testimony relating to the events surrounding the giving of the defendant's confession has already been discussed, was present at the fatal fire. He testified that, in sifting through the ashes, he saw a "pour pattern" which appeared to be manmade. Defense counsel objected to this testimony on the ground that Mr. Fulmer had not been called as an expert witness. The State responded:

... I believe he is testifying to observations he personally made upon his entry into the house. He is not offered as an expert on cause and origin, nor has he been asked to give an opinion. He is merely telling what he saw.

The circuit judge ruled that the testimony involved observations as a firefighter, was based on job experience, and was, therefore, admissible.[3]

Another witness called by the State was Paul Ritchie, whose testimony relating to the events surrounding the taking of the defendant's confession has also already been discussed, worked for the State Fire Marshall's Office and was an investigator in the case. He testified:

Upon entering the house ... There appeared—the floor had already been cleaned off and there was what was evidence or what appeared to me was a pour pattern ....

observed to him as to what a pour pattern, as he described it, from his observation on the scene."

---

3. Specifically, the court said: "I think that in the performance of his job and his experience it would qualify him to testify to what he saw or

Defense counsel objected to this testimony. The trial judge overruled the objection, basically for the same reason that he had overruled the objection to Mr. Fulmer's "pour pattern" testimony.

On appeal, the defendant argues that the "pour pattern" testimony of Rick Fulmer and Paul Ritchie was not proper since it came from lay witnesses. He points out that Rule 701 of the West Virginia Rules of Evidence provides:

> If the witness is not testifying as an expert, his or her testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

The record shows that both witness Fulmer, who was an investigator for the St. Albans Fire Department, and witness Ritchie, an Assistant State Fire Marshall, Criminal Enforcement Division, were professional firefighters whose work had focused on the investigation of fires. Although the State did not attempt to qualify them as expert witnesses, it is apparent that they were in a position to have peculiar knowledge about "pour patterns," peculiar knowledge that jurors would not ordinarily have.

Relating to this type of situation, the Court, in *State v. Haller*, 178 W.Va. 642, 363 S.E.2d 719, 724 (1987), said:

> [T]his Court has consistently held that a witness with superior knowledge may testify if his testimony is helpful to the jury. "It is firmly established in this state that the opinion of a witness who is not an expert may be given in evidence if he has some peculiar knowledge concerning the subject of the opinion than jurors are ordinarily expected to have." (Citations omitted.)

■ In the same context, in *State v. Haller* the Court also quoted with approval (and reiterated as syllabus point 3 of *State v. Haller*) syllabus point 4 of *Cox v. Galigher*, 158 W.Va. 685, 213 S.E.2d 475 (1975), which holds:

> The determination of whether a witness has sufficient knowledge of the material in question so as to be qualified to give his opinion is largely within the discretion of the trial court, and will not ordinarily be

disturbed on appeal unless clearly erroneous.

In the present case, given the professional specialization of witnesses Fulmer and Ritchie and the character of their testimony, the Court cannot conclude that the admission of that testimony was clearly erroneous.

■ Additionally, as previously indicated, the State called and qualified, without objection from the defendant, Joseph L. Dryden as an expert in the investigation of the origins of fires. Mr. Dryden testified that there were very distinct liquid accelerant pour patterns on the floor of the house which burned in the present case. The State also qualified, over the objection of the defendant, another witness, Eugene Reed Cook, as an expert on the cause and origin of fires. Mr. Cook also testified that he observed a "pour pattern," and he expressed the opinion, based on all his observations, that the fire was an incendiary or set fire. As a result of the additional testimony, the Court can only conclude that the testimony of witnesses Fulmer and Ritchie was, at worst, cumulative and was in no way unreliable. The Court does not believe that the trial court's allowance of it can support a reversal of the defendant's conviction.

■ Lastly, the defendant claims that the indictment was improperly rendered because the circuit court allowed the prosecutor to give an unsupervised instruction to the grand jury.

During the proceedings before the grand jury, the assistant prosecuting attorney asked Sergeant Crawford: "If a person commits a murder in the commission of another felony, that is First Degree Murder, is it not?" Sergeant Crawford answered, "Yes."

On appeal, the defendant claims that this grand jury testimony by the assistant prosecuting attorney violated the rule stated in *State ex rel. Miller v. Smith*, 168 W.Va. 745, 285 S.E.2d 500 (1981), which provides that the prosecutor can only present sworn witness evidence to a grand jury. He argues further that a prosecutor is limited to pre-

senting court-supervised instructions on the law.

The defendant claims that the prosecutor not only caused a police witness to testify as to what the law was, but also instructed the jury, through the testimony, without court supervision. He also claims that the felony murder rule was not correctly defined by Sergeant Crawford before the grand jury, in that the felony murder rule provides that murder is murder in the first degree in a felony murder situation only if the felony involved is one of the felonies enumerated in W.Va.Code § 61–2–1, and not any felony whatsoever, as Sergeant Crawford's testimony would indicate.

It appears that the prosecutor's remarks were not made *sua sponte*. Rather, they were made only after a grand juror asked a witness whether, under the law, the defendant had to intend to set a fire or intend to commit a murder to be deemed to have committed murder.

Although it is true that under the felony-murder rule a homicide is murder only if it occurs during the commission of the specific felonies enumerated in W.Va.Code § 61–2–1, arson is one of those felonies, and it is rather clear under the facts and context of this case that if the deaths of the Dawsons occurred during the commission of any felony, that felony was arson.[4] Under these circumstances, the Court cannot conclude that the grand jury was deceived and rendered a true bill as a result of improper remarks of the prosecutor.

For the reasons stated, the judgment of the Circuit Court of Kanawha County is affirmed.

Affirmed.

BROTHERTON and RECHT, JJ., did not participate.

MILLER, Retired J., and FOX, Judge, sitting by temporary assignment.

---

4. West Virginia Code § 61–2–1, provides, in relevant part:
   Murder ... in the commission of, or attempt to commit, arson, kidnapping, sexual assault, robbery, burglary, breaking and entering, escape from lawful custody, or a felony offense of manufacturing or delivering a controlled substance ... is murder in the first degree.