**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Johnson OBASA, Defendant–Appellant.**

No. 93–5483.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 7, 1993.

Decided Feb. 4, 1994.

Jacquelyn A. Jess, Asst. U.S. Atty. (argued and briefed), Office of the U.S. Atty., Covington, KY, Karen K. Caldwell, Lexington, KY, for plaintiff-appellee.

Harry P. Hellings, Jr., Dean A. Pisacano (argued and briefed), Hellings & Nutter, Covington, KY, for defendant-appellant.

Before: RYAN and SUHRHEINRICH, Circuit Judges; and LIVELY, Senior Circuit Judge.

LIVELY, Senior Circuit Judge.

The outcome of this appeal turns on our determination of when the warrantless arrest of the defendant-appellant occurred. Both the government and Johnson Obasa agree that Obasa was arrested; they disagree on whether the arrest took place before or after the arresting officer had probable cause.

## I.

Resolution of this issue requires a full factual statement.

## A.

On September 2, 1992, Sergeant David Bunning of the Cincinnati–Northern Kentucky International Airport Police Department, along with officers from the Drug Enforcement Agency and the Bureau of Alcohol, Tobacco and Firearms, was monitoring the arrival of a flight into Cincinnati from New York City. The flight was closely scrutinized because the officers claimed that it was known to be a common courier flight for drugs. The officers watched two black men deplane separately, one in a business suit, the other in jeans and a baseball cap. The man in the suit asked a Delta agent for directions to a connecting flight, and the other man walked on ahead. One officer then noted that the two men were speaking to each other but were not looking at each other. Believing this was unusual, Officer Bunning pursued the matter. He went to the gate where the men had been speaking and asked the agent for a list of connections to the Little Rock flight scheduled to depart from that gate. Bunning was told that only two passengers were transferring from the New York City flight (from which the two men had just departed) to the Little Rock flight. The tickets, which were issued to Robert and David Williams, were one-way tickets and were purchased on a credit card less than fifteen minutes prior to departure from New York City.

Based on this information, Bunning decided to talk to the men. Bunning found the man in jeans in the Little Rock departure area and asked the man his name. The man identified himself as Victor Obasa and presented a New York driver's license. Bunning stated he noticed that the man had a Nigerian accent, which he found significant because of the high rate of credit card fraud and narcotics involvement among Nigerians.

Victor Obasa told Bunning that he was traveling alone, and Bunning asked to see his ticket. After looking through his garment bag, Victor Obasa said that his brother must have his ticket. When reminded that he claimed to be traveling alone, Victor Obasa said that he was travelling with his brother. When Bunning stated that he had information that the two men were traveling under the name of Williams, Victor Obasa initially made no response. He then told the agent that a friend had purchased the tickets.

Bunning asked for permission to search Victor Obasa's bag and his person. Victor asked what the officer was looking for; when Bunning told him narcotics, Victor Obasa agreed to the search. They walked to a small room 30 to 40 feet away where Bunning conducted searches. Bunning found clothes in the bag, but did not go through the pockets. When he searched Victor Obasa's person, he found a wallet. Victor Obasa consented to a search of the wallet, and Bunning found a Virginia driver's license and a Visa card in the name of Julius Sheppard. Victor Obasa's explanations for having two driver's licenses and a credit card in someone else's name further increased Bunning's suspicions. Bunning told Victor Obasa that he was being detained for investigation of possible credit card fraud.

Believing that Victor's brother, the defendant Johnson Obasa, was probably also involved in the credit card fraud, Bunning left Victor Obasa in the room with one of the other officers and went to search for the brother. After failing to locate Johnson Obasa in a thorough search of the airport, Bunning sent out a radio description of the defendant. Four or five minutes later, Bunning learned that a person answering the defendant's description had been seen leaving the airport in a taxi. Shortly thereafter, in response to a further radio dispatch, local police stopped a cab in which Johnson Obasa was riding several miles from the airport on Interstate 275. When Bunning arrived at the scene, the cab driver told him that the defendant had asked to be taken to the train station. One of the officers who stopped the taxi had questioned the passenger, who had produced an alien registration card bearing the name Johnson Obasa. Bunning patted Johnson Obasa down and found nothing illegal. Bunning testified that he did not know at that time that the airline tickets had been

purchased with a stolen credit card, but testified he felt he had good reason to believe this was the case. Bunning also stated that Johnson Obasa never identified himself by the name Williams. The defendant denied having been at the airport, even after Officer Bunning said that he had seen the defendant get off the New York flight. Bunning then "immediately" read Johnson Obasa his *Miranda* rights and told him that he was being detained for investigation of counterfeit credit cards or possible credit card fraud. Bunning then had Johnson Obasa transported to the airport police station in a police cruiser driven by one of the officers who had made the stop on I–275.

Meanwhile, back at the airport, Bunning's supervisor had contacted Visa and found out that the airline tickets for the brothers had been purchased on a credit card belonging to Virginia McQuade but issued in the name of Robert Williams. The Visa representative also told police that several large and suspicious cash advances had been obtained on the card in the past few days. The advances were suspicious because they were all for the same amount ($1900) and were made so close together. In addition, the card had been used to purchase tickets on the American Airlines flight from New York to Nashville several days earlier.

Based on this information, which was related to him after he and Johnson Obasa had returned to the airport, Bunning made another inspection of Victor Obasa's bag. In the pockets of two pairs of pants, Officer Bunning found two driver's licenses and two matching Visa cards, in the name of David Shaw and Robert Williams. Each driver's license contained a picture of Johnson Obasa. Both licenses were false and contained false social security numbers.

According to Bunning, no more than thirty minutes elapsed between the initial conversation with Victor Obasa and the receipt of the information from Visa indicating credit card fraud.

### B.

After hearing Bunning's testimony at a "probable cause hearing," a magistrate judge found the evidence was sufficient to hold Johnson Obasa over to a grand jury.

The federal grand jury returned a four-count indictment against Johnson Obasa, including one count of conspiracy, one count of aiding and abetting the use of stolen credit cards, one count of use of a false social security number, and one count of aiding and abetting use of stolen credit cards to purchase airline tickets. Johnson Obasa originally pled not guilty to all charges.

On September 29, 1992, Victor and Johnson Obasa filed a motion to suppress all evidence obtained as a result of the warrantless searches and arrests that took place on September 2. After a hearing at which Bunning again testified substantially as at the earlier hearing, the magistrate judge denied the motion. Johnson Obasa then moved for rearraignment and entered a conditional guilty plea. He was sentenced to five years' probation, with the condition that he pay restitution to Chase Manhattan Financial Services, and now appeals.

### II.

### A.

At oral argument, counsel for the government conceded that Bunning did not have probable cause to arrest Johnson Obasa when he detained the defendant on I–275 and caused him to be transported to the airport police department in the marked police cruiser. As in her brief, however, government counsel argued that the detention of Johnson Obasa on the highway and his transportation in the police car to the airport police department never went beyond the bounds of an investigative stop or detention. It is the government's position that the detention did not reach the level of an arrest requiring probable cause until Johnson Obasa was formally arrested at the airport after the driver's licenses bearing his picture and a fictitious name were recovered during the second search of Victor Obasa's carry-on garment bag.

Bunning estimated that no more than 30 minutes expired between his first questions to Victor Obasa and discovery of the evidence that clearly implicated Johnson Obasa. Ne-

vertheless, Bunning testified that the original discrepancies in Victor Obasa's stories and the second driver's license he was carrying caused him to look for Johnson Obasa "because I felt possibly his [Victor's] brother was also involved in some kind of credit card fraud." The government contends that it was not unreasonable to extend the investigative stops for 30 minutes while further information was being obtained. Thus, the government maintains that Johnson Obasa was subjected to a temporary detention that lasted no longer than necessary to effectuate the purpose of the stop.

As further justification for detaining Johnson Obasa on the highway and causing him to be taken to the airport police department, the government points to the defendant's "flight" from the airport. Finally, the government argues that there was no less intrusive means available for continuing the investigation of Johnson Obasa's possible role in a credit card scheme to defraud than searching Johnson Obasa, placing him in the police cruiser and directing that he be taken to the airport police department.

### B.

Although the government argued at length that the 30-minute detention was reasonable, the defendant did not pitch his argument on the time lapse. Rather, Johnson Obasa has contended throughout the proceedings that he was arrested during the confrontation on I-275. He bases this assertion on Bunning's actions there under circumstances where the officer had no more than a suspicion that Johnson Obasa might "possibly" be involved with his brother in a credit card fraud. Bunning was acting solely on this suspicion, and when he searched Johnson Obasa he found nothing incriminating. Nevertheless, based on Johnson Obasa's denial that he had been at the airport, Bunning advised him of his *Miranda* rights, told him he was being held on suspicion of credit card fraud, and caused him to be transported to the airport police department in a police cruiser. Under all the circumstances, Johnson Obasa contends, he was arrested at that time. Since the government concedes that it did not have probable cause to arrest him at that time, the arrest was illegal and he should have been released.

### III.

■ The Fourth Amendment prohibits unreasonable searches and seizures. A "seizure" occurs when police detain an individual under circumstances where a reasonable person would feel that he or she is not at liberty to leave. *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). In *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968), the Supreme Court held that a brief investigative stop by an officer who is "able to point to specific and articulable facts" that reasonably justify such an intrusion is not an unreasonable seizure. *Terry* is a narrowly drawn exception to the probable cause requirement of the Fourth Amendment that permits police officers to detain individuals briefly for investigative purposes. It requires a balancing of relatively minor intrusions against legitimate governmental concerns. *Pennsylvania v. Mimms,* 434 U.S. 106, 111, 98 S.Ct. 330, 333, 54 L.Ed.2d 331 (1977). The Supreme Court described the rationale for *Terry* as follows in *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972):

> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response.... A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

*Id.* at 145-146, 92 S.Ct. at 1923.

We described the changes wrought by *Terry* in Fourth Amendment jurisprudence in *United States v. Saperstein,* 723 F.2d 1221 (6th Cir.1983):

> Before *Terry* no seizures of the person were deemed permissible under the

Fourth Amendment absent probable cause. *Terry* created a limited exception to this general rule—allowing investigative steps on something less than probable cause where the governmental interest is important and the law enforcement officer is "able to point to *specific* and *articulable* facts, which taken together with *rational* inferences from those facts reasonably warrant that intrusion."

*Id.* at 1229 (quoting *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880).

*Terry* was a "stop and frisk" case where the officer was found justified in detaining the defendant and patting him down for weapons. The *Terry* rule has been expanded to permit investigative stops and temporary seizures based on suspicion of various types of criminal activity. See, *e.g., United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (suspicion that immigration laws were being violated); *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) (occupant of a house detained while search warrant for the house was being executed; warrant made occupant sufficiently suspect to justify temporary seizure.) And, of course, *Terry* has been the basis for numerous airport seizures and searches, some of which were found permissible, *e.g., United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); and some of which have been found to have involved actions by detaining police that took them over the *Terry* line, resulting in *de facto* arrests, *e.g., Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

■ The scope of activities permitted during an investigative stop is determined by the circumstances that initially justified the stop. *United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985) (quoting *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879). Thus,

the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information

confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released.

*Berkemer v. McCarty,* 468 U.S. 420, 439–40, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984) (footnotes omitted). The Supreme Court has refused to apply the "balancing test" that justifies "substantially less intrusive" *Terry* stops to custodial interrogations. *Dunaway v. New York,* 442 U.S. 200, 210–12, 99 S.Ct. 2248, 2255–56, 60 L.Ed.2d 824 (1979). When police actions go beyond checking out the suspicious circumstances that led to the original stop, the detention becomes an arrest that must be supported by probable cause. *Id.* at 212, 99 S.Ct. at 2256. Nevertheless, the Court has stated that there is no "litmus-paper test … for determining when a seizure exceeds the bounds of an investigative stop." *Royer,* 460 U.S. at 506, 103 S.Ct. at 1329. The "endless variations in the facts and circumstances" of cases raising the issue make a bright-line test impracticable. *Id.* Further, though investigative stops must be brief, there can be no rigid time limit for a permissible *Terry* stop. *Sharpe,* 470 U.S. at 685–86, 105 S.Ct. at 1574–76.

## IV.

We conclude that Bunning arrested Johnson Obasa without probable cause when he searched him, gave him *Miranda* warnings and caused him to be transported back to the airport police station. On cross-examination Bunning answered "yes" when asked if the police "forcibly brought [Johnson Obasa] to the airport." There was nothing consensual about Bunning's encounter with Johnson Obasa. It may be true that no one of the occurrences during that encounter alone carried the detention over the line from a *Terry* stop to an arrest. Nevertheless, the totality of Bunning's actions present a scenario that cannot be fitted within the confines of a *Terry* stop.[1]

1. Given the minimal investigation conducted by Bunning after his arrival at the location of the taxi on I–275, it appears that Bunning's purpose in having the cab stopped was simply to detain Johnson Obasa permanently rather than to hold him until Bunning could get there to continue the investigation.

## A.

Although Bunning admitted that unlike Victor Obasa, Johnson Obasa was not suspected of drug trafficking, and there was no reason to believe he was armed, Bunning patted him down and searched his person. This search turned up nothing incriminating, only his authentic resident alien identification and a small amount of cash.

■ Bunning testified concerning his extensive experience and training in police work. From this experience he knew that *Miranda* rights are required to be given only to individuals who are in custody. Although giving *Miranda* warnings to a detainee may not automatically convert a *Terry* stop into an arrest, it is "evidence that the nature of the detention ha[s] grown more serious." *United States v. Diaz–Lizaraza*, 981 F.2d 1216, 1222 (11th Cir.1993). If a detention that Bunning insisted was only a *Terry* stop "had degenerated into a custodial interrogation" in which Bunning thought that a *Miranda* warning was required, the decision in *Dunaway* appears to require probable cause for further detention. See *United States v. Knox*, 839 F.2d 285, 297 (6th Cir.1988) (Jones, J. concurring), *cert. denied*, 490 U.S. 1019, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989).

## B.

■ Bunning offered no explanation for his decision to have Johnson Obasa transported to the police station immediately rather than continuing his investigation at the point of detention. No evidence was produced that any one was in danger or that the stopped taxi created any traffic problems. Bunning had used his radio both to have Johnson Obasa located and to have his taxi stopped. Nevertheless, he did not call back to the airport police to determine if the further inquiries had turned up any evidence that incriminated Johnson Obasa. Instead, despite the fact that Johnson Obasa identified himself by his real name and the search produced nothing incriminating, rather than contacting officers at the airport to determine if something incriminating had been turned up, Bunning had Obasa removed to the police station forthwith.

In the context of a discussion of its earlier opinions in *Terry, Adams, Sharpe, Dunaway* and *Royer*, the Supreme Court made the following statement:

> There is no doubt that at some point in the investigative process, police procedures can qualitatively and quantitatively be so intrusive with respect to a suspect's freedom of movement and privacy interests as to trigger the full protection of the Fourth and Fourteenth Amendments. *Dunaway*, [442 U.S.] at 212 [2256]; *Florida v. Royer*, 460 U.S. 491, 499 [103 S.Ct. 1319, 1325, 75 L.Ed.2d 229] (1983) (plurality opinion). And our view continues to be that the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes. We adhere to the view that such seizures, at least where not under judicial supervision, are sufficiently like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause.

*Hayes v. Florida*, 470 U.S. 811, 815–16, 105 S.Ct. 1643, 1646–47, 84 L.Ed.2d 705 (1985) (footnote omitted).

While Johnson Obasa was not taken from his home to the police station, he was taken "forcibly" from a public place where he had a right to be. *Dunaway* also involved the transportation of a suspect to the police station where there was no probable cause for an arrest. The Court stated:

> Petitioner was not questioned briefly where he was found. Instead, he was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room. He was never informed that he was "free to go"; indeed, he would have been physically restrained if he had refused to accompany officers or had tried to escape their custody.... The mere facts that petitioner was not told he was under arrest, was not "booked," ... do not make petitioner's seizure even roughly analogous to the narrowly defined intrusions involved in *Terry* and its progeny. Indeed any "exception" that could

cover a seizure as intrusive as that in this case would threaten to swallow the general rule that Fourth Amendment seizures are "reasonable" only if based on probable cause.

442 U.S. at 212, 99 S.Ct. at 2256–57.

This court recently held that securing a detainee in the back seat of a police car while officers interrogated the detainee's companion, passed the limits of a *Terry* stop and "crossed the line into an arrest.... [u]nder the totality of the[ ] circumstances." *United States v. Richardson,* 949 F.2d 851, 857–58 (6th Cir.1991). This was true, even though the detainee was not transported to the police station.

## V.

### A.

The government places principal reliance upon two decisions: *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) and *United States v. French,* 974 F.2d 687 (6th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1012, 122 L.Ed.2d 160 (1993). We believe that both cases are readily distinguishable from the present case and that neither requires affirmance of the district court's judgment.

The question in *Sharpe,* as stated by the Supreme Court, was "whether an individual reasonably suspected of engaging in criminal activity may be detained for a period of 20 minutes, when the detention is necessary for law enforcement officers to conduct a limited investigation of the suspected criminal activity." 470 U.S. at 676–77, 105 S.Ct. at 1570. The entire concern of the *Sharpe* Court centered around the length of the detention. The Court refused to lay down a *per se* rule as to the permissible length of an investigative detention. In holding that the 20–minute detention did not convert a *Terry* stop into a *de facto* arrest, the Court found that the police pursued their investigation diligently during the 20 minutes and there was no delay that was unnecessary to a diligent investigation. *Id.* at 687, 105 S.Ct. at 1576.

Inasmuch as we have not based our conclusion that Johnson Obasa was arrested on I–275 on the length of the detention, *Sharpe*

has little relevance here. Our conclusion is based on the actions of Bunning, taken as a whole, which are inconsistent with a *Terry* stop, not on the fact that 30 minutes may have elapsed.

We believe that *French* has even less application here. In *French* this court affirmed the denial of a motion to suppress evidence taken from vehicles during roadside searches. Except for the fact that both cases involved stopping vehicles on an interstate highway, there is little resemblance between *French* and the instant case. In *French,* the officers who stopped two vehicles had observed them violating traffic laws: both were clocked speeding, and one was also seen making erratic movements. 974 F.2d at 690. The driver of the truck seen weaving on the highway was found to be intoxicated when he stepped out. The officer who stopped the truck smelled marijuana and obtained a warrant to search it. The driver of the other vehicle eventually consented to a search of that car. The court held that under all the circumstances the passage of 45 minutes between the time the passenger car was stopped and its driver consented to the search was not unreasonable.

The facts of *French* do not fit this case, and the decision turned on weighing factors not present here.

### B.

The government also argues that Johnson Obasa's "flight" necessitated transporting him from the roadside to the airport police department. It is true that if the defendant had not left the airport there would have been no need to return him. The question is whether Bunning should have made further investigation related to his suspicion of credit card fraud before he detained Obasa and had him transported to the airport police department. Bunning could have used his radio to check back with airport police rather than searching the defendant, immediately giving him *Miranda* warnings and causing him to be transported to the airport police station. When he took these steps Bunning knew of no facts implicating Johnson Obasa in credit card fraud. His actions were based on his

feeling that the defendant might "possibly" be involved in credit card fraud.

Further, with respect to "flight," the cases cited by the government all involved attempts by suspects to elude the police *after* officers had indicated a desire to talk with them. In this case Bunning testified that he paid little attention to Johnson Obasa, who did not fit a drug courier profile. Furthermore, the magistrate judge found that Johnson Obasa "could not have known that he had been observed by Bunning departing the New York flight, and that he had been observed by Agent Gregory communicating with Victor in the unusual manner of not maintaining eye contact." There was absolutely no proof that Johnson Obasa was even in the area when Bunning approached his brother. While Johnson Obasa's leaving the airport may have been unusual, there was no proof that he was "fleeing" from anyone or anything. Since the government concedes that Bunning did not have probable cause to arrest Johnson Obasa during their roadside encounter, it is clear that his departure, while adding to Bunning's suspicions, did not add a missing ingredient required to justify an arrest at that point.

### CONCLUSION

Bunning's actions were inconsistent with the limits of a *Terry* stop as set out in *Berkemer*, where the Supreme Court stated that during a *Terry* stop "the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.... And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released." 468 U.S. at 439–40, 104 S.Ct. at 3150. So far as this record shows, after confirming Johnson Obasa's identity, Bunning asked him nothing about credit cards or fictitious driver's licenses. Yet Victor Obasa was being detained at the airport solely because of suspicions aroused by his having two driver's licenses and a credit card in a name other than his own. Bunning searched Johnson Obasa and found no such documents in his possession at the time he decided to hold Johnson Obasa and caused him to be re-

turned to the airport. Bunning had learned only that he lied about having traveled to Cincinnati by a Delta flight with his brother. None of the facts that caused Victor Obasa to be detained had been shown to apply to Johnson Obasa.

By failing to make any effort to connect Johnson Obasa with his brother's suspected criminal activity before detaining him and sending him back to the airport, Bunning clearly did not use the "least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Royer*, 460 U.S. at 500, 103 S.Ct. at 1325–26. The government failed to carry its burden of demonstrating that the seizure of Johnson Obasa "was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *Id.*

The judgment of the district court is reversed with directions to dismiss the charges against Johnson Obasa.