**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**James ERWIN, Jr., Defendant–Appellant.**

No. 94–1766.

United States Court of Appeals,
Sixth Circuit.

Argued May 16, 1995.

Decided Dec. 8, 1995.

Christopher P. Yates (argued and briefed), Office of U.S. Atty., Detroit, MI, for plaintiff-appellee.

Kenneth M. Mogill (argued and briefed), Mogill, Posner & Cohen, Detroit, MI. for defendant-appellant.

Before: JONES and RYAN, Circuit Judges; MATIA, District Judge.*

---

* The Honorable Paul R. Matia, United States District Judge for the Northern District of Ohio, sitting by designation.

MATIA, District Judge, delivered the opinion of the court, in which JONES, J., joined. RYAN, J. (pp. 223–26), delivered a separate dissenting opinion.

MATIA, District Judge.

Defendant-appellant, James Erwin, Jr., appeals his conviction entered after he pleaded guilty to possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1). We are asked to determine whether the district court erred in (1) denying defendant-appellant's motion to correct improper assignment of the case, and (2) denying defendant-appellant's motion to suppress. For the reasons that follow, the conviction is reversed and remanded.

### I.

At about 6:45 p.m. on July 31, 1992, Livingston County Sheriff's Deputy Jeffrey Wagner was on patrol when he received a police radio broadcast concerning a silver vehicle, including a license plate number, being operated by a possibly intoxicated black male. In response to the radio broadcast, Deputy Wagner drove to the Oasis Truck Stop, a large gas station and restaurant facility at the intersection of M–59 and U.S. 23 in Livingston County, Michigan.

When Deputy Wagner arrived at the truck stop, he saw defendant James Erwin, Jr. standing outside a car matching the broadcast description. Upon making eye contact with Erwin, Deputy Wagner noted that he appeared "a little more nervous" than average. As Erwin attempted to return to his car, Deputy Wagner advised him to "stay there" and explained the nature of the contact. Although Deputy Wagner testified that he neither smelled alcohol on Erwin's breath nor perceived any other signs of intoxication, he proceeded to ask Erwin for his license, car registration and proof of insurance. Erwin produced his driver's license and a car rental agreement, stating that he had borrowed the rental car from a friend. Upon running a routine license check, Deputy Wagner learned that Erwin had a prior rec-ord for drugs and weapons and was recently off parole.

It was at this point that Livingston County Sheriff's Deputy Michael Lawry,[1] who was privy to the same radio communication, arrived at the scene and asked Deputy Wagner whether he had had a chance to "pat down" Erwin, to which Wagner responded that he had not. Upon performing the pat down search, Deputy Lawry discovered a pager, $846.00 in cash and $135.00 in food stamps. While he was conducting the search, Deputy Lawry noticed a cellular phone and what appeared to Lawry to be drug paraphernalia on the front seat of Erwin's car. In response to the question of whether Erwin had anything in the car which he shouldn't, such as drugs or guns, Erwin responded that he did not. Deputy Lawry then stated, "Well, then, you don't mind if I look around in the car then, do you?", to which Erwin replied, "No." Lawry proceeded to search the car. A search of the car revealed a one-kilogram package of cocaine.

Approximately seven weeks prior to this incident, on June 7, 1992, a warrant-based search of a house located in Saginaw, Michigan, turned up various drugs, a firearm and papers bearing Erwin's name. The search also produced papers and mail indicating that Erwin was connected to a second residence located in Saginaw. Consequently, a warrant-based search was conducted later that same day at the second residence. This search yielded drug paraphernalia with heroin residue, $4,500.00 in cash, a pager, a police scanner and documents linking Erwin to both residences.

On June 16, 1993, in the Northern Division of the United States District Court for the Eastern District of Michigan ("Northern Division") at Bay City, Erwin was charged in a one-count criminal complaint with possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841. Although the complaint outlined the searches and seizures that occurred in Saginaw, the sole charge referred exclusively to the July 31, 1992, arrest of Erwin at the Oasis Truck Stop in Livingston County.

---

**1.** The Record of District Court Proceedings ("Record") refers to Michael Hawry as well as Michael Lawry. For purposes of this opinion, he will be referred to as Michael Lawry.

At his detention hearing, Erwin requested that the case be transferred to the Southern Division of the United States District Court for the Eastern District of Michigan ("Southern Division") at Flint, pursuant to Local Rules 200.1 and 100.1(c) and (d) of the Eastern District of Michigan. Over the government's objection, the magistrate judge granted Erwin's motion.

On June 30, 1993, a grand jury in the Northern Division returned a six-count indictment against Erwin, charging conspiracy to distribute cocaine within the Northern Division of the Eastern District of Michigan, various other drug and weapons charges stemming from the warrant-based searches that took place in Saginaw on June 7, 1992, and a single charge mirroring the June 16th complaint flowing directly from the events that transpired on July 31, 1992, at the Oasis Truck Stop in Livingston County.

The six-count indictment was assigned to the Northern Division docket; accordingly, Erwin was arraigned in the Northern Division on July 20, 1993. On July 29, 1993, Erwin filed, in the Southern Division case, a motion to correct improper assignment of the Northern Division indictment. On August 24, 1993, the district judge denied Erwin's motion, declaring void the magistrate judge's June 16th order transferring the original case to the Southern Division.

On October 18, 1993, Erwin filed a motion seeking to suppress the fruits of the two warrant-based searches in Saginaw as well as the cocaine seized in the warrantless search in Livingston County. After the motion to suppress was denied, Erwin entered into a plea agreement that allowed him to appeal from the district court decisions denying his motion to suppress as well as his motion to correct improper assignment of indictment. On June 28, 1994, Erwin was sentenced to a 264-month prison term. Erwin's timely appeal followed.

## II.

■ In his first assignment of error, Erwin contends that the district court violated a clear legal duty to correct the improper assignment of the case to the Northern Divi-

sion after the return of the indictment. As a basis for his argument, he cites the Local Rules of the Eastern District of Michigan. However, because the Bay City (Northern Division) and Flint (Southern Division) courthouses are both located within the Eastern District of Michigan, Erwin has no constitutional or statutory right to venue in Flint. *United States v. Truglio*, 731 F.2d 1123, 1130 (4th Cir.1984); *United States v. Balistrieri*, 778 F.2d 1226, 1229 (7th Cir.1985), *cert. denied, Balistrieri v. United States*, 477 U.S. 908, 106 S.Ct. 3284, 91 L.Ed.2d 573 (1986); *United States v. Rosier*, 623 F.Supp. 98, 99 (W.D.Mo.1985). Accordingly, Erwin must establish that the district court abused its discretion in refusing to transfer the case from Bay City to Flint. *Truglio*, 731 F.2d at 1130.

■ Rule 18 of the Federal Rules of Criminal Procedure provides that each prosecution must occur "in a district in which the offense was committed." Furthermore, "[t]he trial court shall fix the place of trial within the district with due regard to the convenience of the defendant and the witnesses and the prompt administration of justice." *Id.* According to the notes accompanying Rule 18, a 1966 amendment eliminated a previous requirement that the prosecution shall be in a division in which the offense was committed and distinctly vested discretion in the court to fix the place of trial at any place within the district with due regard to the convenience of the defendant and the witnesses. There has been no allegation by Erwin that the trial in Bay City (Northern Division) inconvenienced either himself or the witnesses, or that it delayed the administration of justice. Erwin has alleged, on the other hand, that the prosecution engaged in judge-shopping by trying the case in the division in which the six-count indictment was returned. This allegation is directed toward the prosecution rather than the district judge; consequently, it is an insufficient basis for reversing the district court's decision. For this reason, and because five of the six offenses were committed within the area encompassed by the Northern Division, we find that the district court did not abuse its discretion in holding the trial in the

Northern Division of the Eastern District of Michigan.

## III.

In his second assignment of error, Erwin contends that the district court erred in denying his motion to suppress the cocaine that was discovered as a result of the July 31 search of Erwin's car on the basis that the deputies exceeded their authority to detain Erwin and search his vehicle after the suspicion that gave rise to the initial stop had been resolved. When reviewing the denial of a motion to suppress evidence, the appellate court must consider the evidence in the light most favorable to the government. *United States v. Williams*, 962 F.2d 1218, 1221 (6th Cir.), *cert. denied*, 506 U.S. 892, 113 S.Ct. 264, 121 L.Ed.2d 194 (1992). This Court applies the clearly erroneous standard to findings of fact when reviewing the ruling of a district court on a motion to suppress, but reviews conclusions of law *de novo. Id.*

*Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), permits a "stop and frisk" by police where the stop is based on specific, articulable facts indicating reasonable suspicion that a crime has been committed. *Id.* at 21, 88 S.Ct. at 1879–80. Furthermore, the scope of activities permitted during an investigative stop is determined by the circumstances that initially justified the stop. *United States v. Obasa*, 15 F.3d 603, 607 (6th Cir.1994); *United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985). Once those circumstances are resolved, the detainee must be released. *Obasa*, 15 F.3d at 607, *quoting Berkemer v. McCarty*, 468 U.S. 420, 439–40, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984).

Deputy Wagner's testimony at the suppression hearing reveals that shortly after stopping Erwin, Wagner was standing two feet from Erwin and failed to detect alcohol on his breath. Wagner did not conduct a sobriety test. Furthermore, a visual observation of Erwin failed to reveal glazed eyes, slurred speech, dilated pupils or any of the numerous signs indicating that Erwin may have been under the influence of narcotics or alcohol. According to Wagner's testimony, it was Erwin's nervous demeanor that justified Wagner's continued detention and investigation—despite Wagner's experience, as testified, that it is not uncommon for innocent people to get nervous in the presence of police officers.

The lack of evidence regarding Erwin's possible intoxication is corroborated by Deputy Lawry's testimony. Although Lawry confirmed Wagner's assessment as to Erwin's nervous demeanor, he testified that Erwin was coherent, lucid and did not exhibit "any characteristics" of intoxication. When asked whether he thought Erwin was under the influence of narcotics at the time, Lawry responded,

> As far as controlled substances, I thought possibly due to the, what I believed to be, narcotics paraphernalia and his original nervous demeanor, but in speaking to him and observing him, he didn't—he was very cognizant of what was going on and aware of what was happening.

Transcript of Motion Hearing, p. 87, Record, p. 111.[2] As the district judge stated at page 16 in his Memorandum Opinion and Order,

> Deputy Hawry (sic) was watching the reactions of the defendant and by this time noted that he did not appear to be intoxicated or under the obvious influence of any drug, that he seemed awake and aware, that he seemed of reasonable intelligence, and that he seemed to know what was going on.

Record, p. 35.

Thus, construing the evidence in a light most favorable to the government, the facts show that Erwin displayed no signs of being under the influence of either alcohol or drugs. He was sweating and appeared nervous, which is not particularly unusual for someone stopped by police officers in the middle of summer. As noted heretofore, the scope of activities permitted during an investigative stop is determined by the circum-

---

**2.** The narcotics paraphernalia Deputy Lawry referenced were a cellular telephone, a mirror and a blackhead remover, mistakenly thought to be a coke spoon, that he allegedly saw in the front seat of Erwin's car when he walked up to Erwin to perform the pat down search.

stances that initially justified the stop. The circumstance initially justifying this particular stop was the possibility of intoxication by a person operating a motor vehicle. Once the officers satisfied themselves that Erwin was not operating his vehicle under the influence of alcohol or narcotics, Erwin should have been released. The record shows that the police officers made this determination *before* they obtained additional information that may, or may not, have provided a basis for further inquiry. Consequently, the evidence seized thereafter was obtained improperly and should have been suppressed.

Interestingly, the Ohio Supreme Court reached the same conclusion that the majority reaches here in *State v. Robinette*, 73 Ohio St.3d 650, 653 N.E.2d 695 (1995).[3] In *Robinette*, a deputy sheriff stopped the defendant for driving his car in excess of the posted speed limit. After returning the defendant's driver's license, the deputy asked him whether he could search the car. The defendant consented and was arrested for possession of a small amount of drugs. The majority of the Ohio Supreme Court stated it was

> ... convinced that the right, guaranteed by the federal and Ohio Constitutions, to be secure in one's person and property requires that citizens stopped for traffic offenses be clearly informed by the detaining officer when they are free to go after a valid detention, before an officer attempts to engage in a consensual interrogation....
>
> ... [W]e do not believe that this legality [of consensual encounters between police

and citizens] should be used by police officers to turn a routine traffic stop into a fishing expedition for unrelated criminal activity....

73 Ohio St.3d at 655, 653 N.E.2d 695.

The majority opinion in *Robinette* further declared that in future traffic stops,

> [a]ny [police] attempt at consensual interrogation must be preceded by the phrase "At this time you legally are free to go" or by words of similar import.

*Id.* However, the majority in the case *sub judice* does not choose to go as far as the Ohio Supreme Court did in *Robinette*. "The 'endless variations in the facts and circumstances' of cases raising the issue make a bright-line test impracticable." *Obasa*, 15 F.3d at 607, *quoting Florida v. Royer*, 460 U.S. 491, 506, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229, 242 (1983). Rather, a court should analyze the scope of activities permitted during a valid detention in light of the circumstances that initially justified the stop. After the traffic matter was concluded in the instant case, the defendant-appellant should have been released.

## IV.

For the foregoing reasons, the district court's order denying Erwin's motion to correct improper assignment is AFFIRMED; and the district court's order denying Erwin's motion to suppress is REVERSED. The case is hereby REMANDED for further proceedings.

> This decision seeks to clarify the law in West Virginia. By today's decision, we recognize the "no seizure" notion justifying brief police/citizen encounters irrespective of reasonable suspicion. Any further questioning, i.e., investigative interrogation, would have to be either justified by *Terry*-type suspicion or accompanied by the "free to go, etc." *Mays* warning, the latter ensuring the voluntariness of the encounter. Involuntary detention, like that which occurred in *Mays* and in this case, would amount to an arrest requiring probable cause and compliance with the prompt presentment standards.
> 456 S.E.2d at 467 n. 17.

---

3. Moreover, in a unanimous opinion in *State v. Mays*, 172 W.Va. 486, 307 S.E.2d 655 (1983), the Supreme Court of Appeals of West Virginia adopted the "free to go" rule. It held:

> ... By establishing a clear rule that police investigatory interrogations without presentment to a magistrate are allowable only when the suspect is expressly informed that he is not under arrest, is not obligated to answer any questions and is free to go, we hope to establish a system sufficiently flexible that the innocent are allowed to prove their blamelessness and the police are able effectively and legally to interrogate those who are ultimately proven guilty.

307 S.E.2d at 658. The Supreme Court of Appeals of West Virginia decided *State v. Jones*, 193 W.Va. 378, 456 S.E.2d 459 on March 6, 1995.

RYAN, Circuit Judge, dissenting.

In my judgment, the majority opinion fails to identify the correct issue in this case, omits facts essential to a correct resolution of the real issue, and announces a rule of law wholly foreign, until today, to established Fourth Amendment jurisprudence. I respectfully dissent.

## I.

The issue we are required to decide is whether the defendant's consent to search his vehicle was freely and voluntarily given. The majority opinion never addresses this issue. Instead, it holds, without supporting authority, that once the circumstances justifying an initial *Terry* stop are resolved, the suspect must be released. Indeed, the authority cited in support of this novel view contradicts it. Had the majority opinion taken into account all of the facts relevant to the real issue in the case—whether the defendant voluntarily consented to the search of his vehicle—it may well have avoided the erroneous conclusion it reaches.

## II.

The facts are all important.

Deputy Sheriff Jeffrey Wagner of the Livingston County, Michigan, Sheriff's Department initially approached the defendant, James Erwin, Jr., because Erwin was standing in a truck stop, near a pay telephone, and next to a vehicle which matched the description of one identified in a police radio dispatch as possibly being operated by a drunk and/or reckless driver.

Deputy Wagner testified that as he approached Erwin, the defendant seemed to be attempting to get back into his vehicle as if to leave. Wagner asked Erwin to remain where he was and explained that he was investigating a drunk and/or reckless driving report involving someone driving a vehicle whose description matched Erwin's. During this brief exchange, Wagner noted that Erwin seemed extremely nervous, he was sweating, rubbing his hands together, taking his hat off and putting it back on again several times, and wiping his brows. He also noticed a cellular phone on the front seat and observed that the back seat cushion was "slightly ajar."

The deputy asked Erwin for his driver's license, which the defendant produced. However, the defendant did not have a registration for the vehicle or proof of insurance because, he claimed, he had borrowed the vehicle from someone else and, in all events, the vehicle had been rented. A radio lien check on Erwin's license revealed that Erwin had "several" prior convictions for weapons and drug offenses, and had recently been released from a parole status. While Wagner was running the check on Erwin's license, Deputy Sheriff Michael Lawry arrived on the scene. Lawry noticed that Erwin was "sweating profusely," his eyes were "darting around," and he was continually "reaching into his pocket."

Lawry approached Erwin, patted him down for weapons, and discovered that Erwin was carrying a pager, between $800 and $900 in cash, and $135 in food stamps. Initial questioning revealed that Erwin was not intoxicated, and it did not appear that he was under the influence of drugs. However, the deputies suspected that Erwin might be a drug distributor. They reached that conclusion, the deputies said, because of the combination of the cellular phone, the pager, the nearby public phone, the large amount of cash, the out-of-place back seat cushion, a small mirror and an open cloth case on the front seat of the vehicle which the deputies suspected, mistakenly it turned out, was a "coke spoon," the defendant's criminal background, the suspicious absence of the vehicle registration and proof of insurance, and the defendant's "extremely nervous" demeanor; all articulable facts pointing to a reasonable suspicion of criminal activity.

At this point the deputies decided to question Erwin further and asked him whether he had anything in the vehicle he shouldn't have, like weapons or drugs, to which the defendant responded that he did not. Deputy Lawry then said: "Well, then, you don't mind if I look around in the car then, do you, or would you?" Erwin responded that he would not mind. Deputy Lawry testified that the back seat cushion came forward with

"minimal" effort. Behind the cushion, he found the package of cocaine at issue in this case.

At the suppression hearing, the district court credited the deputy's testimony and found that Erwin's consent to search the vehicle was freely and voluntarily given.

### III.

A threshold issue is whether the police had a reasonable basis for detaining Erwin at all. The record contains ample evidence to justify the deputies in detaining and questioning Erwin, based upon the reasonable, articulable suspicion of drunk or reckless driving derived from the police radio dispatch information. *Terry v. Ohio,* 392 U.S. 1, 16–19, 88 S.Ct. 1868, 1877–79, 20 L.Ed.2d 889 (1968). Police are generally justified in stopping an individual and asking for identification when relying on information transmitted by a valid police bulletin. *See United States v. Hensley,* 469 U.S. 221, 232, 105 S.Ct. 675, 682, 83 L.Ed.2d 604 (1985).

Although the majority opinion does not dispute the lawfulness of the initial detention of Erwin for questioning, it concludes, under the authority of *Terry,* that the deputies were not permitted to *continue* questioning Erwin once the *initial* reasonable suspicions that justified the stop were dispelled. The majority places great weight on the fact that Erwin was not in fact intoxicated. However, under *Terry,* officers are justified in posing questions to a person they lawfully stop and in detaining him briefly while attempting to obtain further information. *Id.* Simply put, there is no constitutional rule of law that proscribes detention for further questioning once the justification for the initial *Terry* stop is satisfied. That, of course, is particularly so where there is a reasonable, articulable basis to suspect criminal activity other than that for which the original stop was made. As in all Fourth Amendment inquiries, the test is one of reasonableness. The question to be asked is whether " 'the facts available to the officer at the moment of the seizure . . . "warrant a man of reasonable caution in the belief" that the action taken was appropriate?' " *Id.* at 233, 105 S.Ct. at 682. The concept of "reasonable suspicion"

is not " 'readily, or even usefully, reduced to a neat set of legal rules.' " *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (citation omitted). Rather, the validity and scope of the stop depend upon the totality of the circumstances. *Id.* at 8, 109 S.Ct. at 1585–86.

Although any *one* of the factors taken into account by the deputies, considered separately, might well be consistent with innocent behavior, taken together, they justify, at the very least, a reasonable suspicion that Erwin was engaged in criminal activity. *See id.* at 9, 109 S.Ct. at 1586. But even assuming that all the factors with which the deputies were faced did not amount to articulable facts pointing to a reasonable suspicion, there were, nonetheless, ample grounds to ask Erwin if he would consent to a search of his vehicle. A law enforcement officer does not violate the Fourth Amendment merely by approaching an individual, even when there is no reasonable suspicion that crime is afoot, and asking him whether he is willing to answer some questions. *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323–24, 75 L.Ed.2d 229 (1983). The Constitution does not prohibit a law enforcement officer from engaging an individual in conversation; and that is not less so when the conversation includes a request for consent to conduct a search of the individual or his vehicle. *United States v. Dunson,* 940 F.2d 989, 993–94 (6th Cir.1991) (citing *Berkemer v. McCarty,* 468 U.S. 420, 435–42, 104 S.Ct. 3138, 3147–52, 82 L.Ed.2d 317 (1984)), *cert. denied,* 503 U.S. 941, 112 S.Ct. 1488, 117 L.Ed.2d 629 (1992). "The Fourth Amendment proscribes unreasonable searches and seizures; it does not proscribe voluntary cooperation." *Florida v. Bostick,* 501 U.S. 429, 439, 111 S.Ct. 2382, 2389, 115 L.Ed.2d 389 (1991).

### IV.

Because the search of defendant's car was not preceded by an impermissible seizure under the Fourth Amendment, Erwin's consent, if freely and voluntarily given, would have entirely justified the search of the vehicle. *United States v. Mendenhall,* 446 U.S. 544, 558, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980). The question of voluntary consent is

one of fact to be determined by the totality of the circumstances and will not be reversed unless clearly erroneous. *United States v. Winfrey,* 915 F.2d 212, 218 (6th Cir.1990), *cert. denied,* 498 U.S. 1039, 111 S.Ct. 709, 112 L.Ed.2d 698 (1991); *United States v. Rose,* 889 F.2d 1490, 1494 (6th Cir.1989).

The majority opinion does not consider whether consent was freely and voluntarily given because it concludes that once the circumstances justifying the initial stop were resolved, Erwin had to be released. Majority op. at 221 (citing *United States v. Obasa,* 15 F.3d 603, 607 (6th Cir.1994)). There is simply no authority to support such a narrow black-letter rule. *Obasa,* the case cited in the majority opinion, does not support the majority's new rule. To the contrary, *Obasa* specifically holds that:

> When police actions go beyond checking out the suspicious circumstances that led to the original stop, the detention becomes an arrest that must be supported by probable cause.... *Nevertheless, ... there is no "litmus-paper test ... for determining when a seizure exceeds the bounds of an investigative stop."* ... The "endless variations in the facts and circumstances" of cases raising the issue *make a bright-line test impracticable. ... [T]here can be no rigid time limit for a permissible Terry stop.*

*Obasa,* 15 F.3d at 607 (emphasis added) (quoting *Royer,* 460 U.S. at 506, 103 S.Ct. at 1329). Thus, the *per se* rule announced in the majority opinion is directly contradicted by the case cited as authority. As additional support for the novel rule it establishes today, the majority opinion cites a footnote statement in a West Virginia Supreme Court of Appeals case [1] decided under the West Virginia Constitution, and a decision of the Ohio Supreme Court [2] which establishes a new warning police officers must give to persons stopped for traffic violations in Ohio before "an officer attempts to engage in a consensual interrogation." I agree with the statement in the majority opinion that both decisions are "interesting[ ]," but manifestly, neither is Fourth Amendment authority in this circuit.

There is simply *no* rigid time or scope against which to measure a valid *Terry* stop. *See, e.g., Sharpe,* 470 U.S. at 685, 105 S.Ct. at 1575; *Obasa,* 15 F.3d at 607, and, under the Fourth Amendment, no arbitrary point beyond which an officer may not request permission to conduct a vehicle search. The voluntariness of Erwin's consent is the real issue in this case—the one framed in the parties' briefs and argued at oral argument—and it should have been resolved in the majority opinion.

Erwin argues that he was not asked whether he would consent to a search of his vehicle, but rather that he "acquiesced" to the deputy's "statement" about whether he could search his vehicle. The trial court's finding of fact was otherwise.

A consent search is a standard law enforcement investigatory technique. *Schneckloth v. Bustamonte,* 412 U.S. 218, 231–32, 93 S.Ct. 2041, 2049–50, 36 L.Ed.2d 854 (1973). The voluntariness of a consent to search is not affected by the consenter's knowledge that he has a right to refuse to consent. *Id.* at 234, 93 S.Ct. at 2051. Although, whether the suspect was informed of his right to refuse consent is one of the many factors to consider in determining the voluntariness of the consent, the police are under no legal obligation to inform a suspect of his right to refuse consent. "[I]t would be thoroughly impractical to impose on the normal consent search the detailed requirements of an effective warning." *Id.* at 231, 93 S.Ct. at 2050.

Here, the district court conducted an exhaustive examination of the evidence, carefully assessed the credibility of the witnesses, and found that Erwin "took a chance, gave a knowing consent, but lost the gamble." On issues of voluntariness, the trial court's finding "represents the last word unless it is clearly erroneous." *Dunson,* 940 F.2d at 994. A finding by the district court is clearly erroneous when, although there is evidence to support it, the reviewing court, upon examination of the record, is left with a definite

---

**1.** *State v. Jones,* 193 W.Va. 378, 456 S.E.2d 459, 466–67 n.17 (1995).

**2.** *State v. Robinette,* 73 Ohio St.3d 650, 653 N.E.2d 695, 699 (1995).

and firm conviction that a mistake has been committed. *United States v. Tillman,* 963 F.2d 137, 143 (6th Cir.1992).

There is no evidence that the deputy threatened Erwin or coerced him in any way, and Erwin does not claim that he misunderstood the deputy's question. As the district court found, Erwin's consent was unequivocal and specific: "No," he didn't mind. There is no basis in the record to conclude that the district court clearly erred in finding that Erwin freely and voluntarily consented to the search of his vehicle.

### V.

The rule announced in the majority opinion effectively alters, and is wholly inconsistent with, *Terry* and its progeny. The logical application of the majority's novel new rule means that from now on law enforcement officers may not even detain a driver long enough to run a lien check on a suspect's driver's license after making a valid *Terry* stop, if the *original* purpose for which the driver was stopped is satisfied.

I respectfully dissent.