NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0462n.06
Filed: August 1, 2008

07-5106

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| NEGASSI DEJUAN RICHARDSON, | ) | WESTERN DISTRICT OF TENNESSEE |
| | ) | AT MEMPHIS |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

Before: ROGERS and McKEAGUE, Circuit Judges, and ADAMS,[*] District Judge.

JOHN R. ADAMS, District Judge.    Defendant-appellant, Negassi Dejuan Richardson, appeals his conviction entered after he pleaded guilty to possession with intent to distribute at least 50 grams of cocaine base, in violation of 21 U.S.C. § 841(a)(1). We are asked to determine whether the district court erred in denying defendant-appellant's motion to suppress. For the reasons that follow, the conviction is affirmed.

I.

---

[*]The Hon. John R. Adams, United States District Judge for the Northern District of Ohio, sitting by designation.

At approximately noon on March 30, 2004, a cooperating informant ("CI") informed John Forrester, a detective with the Collierville Police Department, that a man possessing approximately nine ounces of crack cocaine would arrive at the Fairfield Inn at 6010 Macon Cove in Memphis, Tennessee, sometime during the evening of March 30th. The CI arranged to purchase the crack cocaine from the man at some point in the evening.

The CI had previously provided credible information to law enforcement officers that had resulted in two seizures of illegal drugs and one arrest. The CI also gave several descriptive characteristics of the man to Detective Forrester. He described the man "as a male black, longer hair, not necessarily short, approximately six feet tall, approximately 180 pounds." (JA 173) The CI also told Detective Forrester that the man would be driving a "newer model black Monte Carlo . . . and he would pull around the back of the Fairfield Inn." *Id.* He stated to this detective that "he knew the guy . . . to go armed occasionally in transporting that much narcotics, he felt like he would be armed." (JA 174)

After the CI provided the above information to Detective Forrester, at approximately 5:00 p.m., officers assigned to the Germantown-Collierville Combined Services Unit, including Detective Forrester, began surveillance in the area of the Fairfield Inn. Kenneth Cardelli, a patrol officer with the Germantown Police Department and, at the relevant time, a detective with the Combined Services Unit, was also present. The officers were in several different unmarked vehicles. Detective Cardelli and three other officers were in an unmarked police car located in the back parking lot of the hotel.

The CI met Detective Forrester at approximately 5:00 p.m. that day and between then and 7:30 p.m. made several phone calls to the man in the presence of Detective Forrester. The man told the CI over the phone that he was running late and the CI relayed this to the detective. During this time, Detective Forrester and the CI were parked across the street from the Fairfield Inn. At approximately 7:30 p.m., Detective Forrester saw a black newer model Monte Carlo--consistent with the CI's description--drive down Macon towards the hotel. Detective Forrester notified the other officers on the scene that the Monte Carlo was approaching and he pulled out onto Macon traveling in the lane next to the Monte Carlo when it turned right into the Fairfield Inn. Detective Forrester testified that he could see the driver of the Monte Carlo through its tinted window and could judge his approximate build and size. (JA 233-36)

The officers observed the Monte Carlo pull into the hotel parking lot, drive around to the back, and back into a parking space. The Monte Carlo parked about three spaces away from Detective Cardelli's car. The Monte Carlo's engine was still running and the headlights were on.

Next, the officers pulled their cars up towards the front of the Monte Carlo, got out of their cars, and approached the Monte Carlo. Some of the officers on the driver's side had their weapons drawn. As the officers pulled up, the driver of the car--later identified to be the defendant--opened the door of his car. The officers detected a very strong odor of marijuana coming from within the defendant's car. Detective Forrester testified that he

began to smell the marijuana when he was "in front of the car about at the bumper" as he approached from the passenger side of the vehicle. (JA 177; *see also id.* 248) Detective Cardelli testified that he could smell marijuana after the defendant opened the car door and exited the vehicle. (JA 115-17)

Detective Cardelli's car was parked in front of the Monte Carlo, but he testified that neither his nor the other vehicles completely blocked the Monte Carlo's exit from the hotel parking lot. (JA 131, 138) He stated that the officers intended to "approach [the defendant] and talk to him" and to "detain him for investigation." *Id.* Detective Cardelli testified that had the defendant driven away he likely would have hit another vehicle. (JA 131) Detective Forrester stated that the defendant could possibly have driven away but it would have been a "tight fit." (JA 219) Detective Forrester also testified that the officers attempted to ensure that the defendant could not use the Monte Carlo as a weapon. (JA 220)

As Detective Cardelli approached the driver's side of the Monte Carlo, he asked the defendant to place his hands where they could be seen and to get out of the car. Defendant initially refused to exit his vehicle, but eventually did exit the Monte Carlo. Detective Cardelli grabbed the defendant's arm as he was getting out of the car. He asked the defendant his name and the defendant said he was Negassi Richardson. Detective Cardelli testified that Richardson fit the description previously provided by the CI to Detective Forrester. (JA 145)

Detective Cardelli noticed that the defendant's left and right front pockets had large bulges in them. He performed a protective pat-down of the defendant and noted that "both pockets had what felt like hard objects in the pockets." (JA 117) Detective Cardelli testified:

> I asked Mr. Richardson what was in the pocket. He didn't answer. I asked him a second time; he didn't answer. So I reach in his right front pocket and pulled out approximately nine ounces of crack cocaine and a small bag of marijuana. In his left pocket was . . . just a little less than $600 in cash.

(JA 121) He testified further that the object in the defendant's right front pocket "felt hard, and I do [sic] not know what it was;" and, based on his experience in law enforcement, the object "could have been" a weapon. (JA 150, 154) The drugs were field-tested and tested positive for cocaine and THC,[1] respectively.

After the officers discovered the drugs, they put the defendant on the ground and handcuffed him. (JA 153 )[2] The officers searched the car and found a set of digital scales and a box of plastic sandwich bags, which are commonly used in the packaging and sale of drugs. Defendant declined to make any statements to the officers, whereupon he was transported to the county jail.

---

[1]Tetrahydrocannabinols ("THC"), which is the main psychoactive substance produced naturally by the marijuana plant.

[2]At the suppression hearing, Richardson testified that the officers put him on the ground and handcuffed him before they searched him. (JA 160-61).

On August 31, 2004, a federal grand jury returned a one-count indictment against Richardson in connection with this incident, charging him with a violation of 21 U.S.C. § 841(a)(1).

On August 4, 2005, Richardson filed a motion seeking to suppress the evidence seized in the warrantless search and arrest of him. On February 3, 2006 and March 2, 2006, the district court held a hearing regarding the motion. Detective Forrester, Detective Cardelli, and the defendant testified at the two-part hearing.

On June 29, 2006, after post-hearing briefing, the district court denied the motion to suppress. The district court found "the officers had at least reasonable suspicion" to detain the defendant for purposes of an investigative detention. (JA 82) Thereafter, Richardson entered into a plea agreement that allowed him to appeal from the district court decision denying his motion to suppress. On January 18, 2007, Richardson was sentenced to a 140-month prison term. Richardson's timely appeal followed.

II.

Richardson appeals the denial of his motion to suppress. When reviewing the denial of a motion to suppress evidence, the appellate court must consider the evidence in the light most favorable to the government. *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir.1998) (*en banc* decision upholding the district court's denial of a motion to suppress evidence that was found during a search of the defendant's vehicle). This Court

applies the clearly erroneous standard to findings of fact when reviewing the ruling of a district court on a motion to suppress, but reviews conclusions of law de novo. *United States v. Smith*, 182 F.3d 473, 476 (6th Cir. 1999). With regard to *Terry*-stop analysis in particular, "[a]lthough the standard of review on the ultimate reasonable suspicion inquiry is *de novo*, the district court is at an institutional advantage, having observed the testimony of the witnesses and understanding local conditions, in making this determination." *United States v. Townsend*, 305 F.3d 537, 542 (6th Cir. 2002).

A.

Richardson contends that he was seized under the Fourth Amendment without probable cause. Although his argument is not entirely clear, Richardson appears to argue in his brief on appeal that the officers exceeded the scope of a *Terry* stop and pat-down without proper justification. He cites *United States v. Richardson*, 949 F.2d 851 (6th Cir. 1991), and then states:

> Officer Forrester Cardelli [sic] testified that the defendant had not violated any law when he entered the parking lot nor when he was handcuffed. When the officers placed handcuffs on Richardson, the officers had went [sic] beyond an investigation to arresting defendant without probable cause.

(Appellant's Br. 12) (citations to the record omitted). Defendant, however, does not develop this argument in his brief and makes no effort to apply *Richardson* to the facts of his own case.

Terry v. Ohio, 392 U.S. 1, 20 L.Ed.2d 889, 88 S. Ct. 1868 (1968), permits a "stop and frisk" by police where the stop is based on specific, articulable facts indicating reasonable suspicion that a crime has been committed.  *Id.* at 21.  Furthermore, "[t]he scope of activities permitted during an investigative stop is determined by the circumstances that initially justified the stop."  *United States v. Obasa*, 15 F.3d 603, 607 (6th Cir. 1994) (citing *United States v. Sharpe*, 470 U.S. 675, 682, 84 L.Ed.2d 605, 105 S.Ct. 1568 (1985)).

Richardson cites *United States v. Roch*, 5 F.3d 894 (5th Cir. 1993), a case which involved a purported suspicion that the subject was a felon in possession of a firearm, in support of his argument that the CI's tip was insufficient to give the officers probable cause to seize him.  This case, however, is distinguishable from the record before us where the *Terry* stop and pat-down were clearly justified by the CI's tip and smell of marijuana from the Monte Carlo.

Officers have the authority to stop and temporarily detain citizens "if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause."  *United States v. Sokolow*, 490 U.S. 1, 7, 104 L.Ed.2d 1, 109 S.Ct. 1581 (1989) (quoting *Terry*, 392 U.S. at 30).  The reasonableness of a *Terry* stop and search is determined by examining "(1) whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to a reasonable suspicion; and (2)

whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand." *United States v. Hardnett*, 804 F.2d 353, 356 (6th Cir. 1986).

The district court's factual findings were not clearly erroneous. Richardson testified that the officers put him on the ground and handcuffed him before they searched him. The district court, however, credited the testimony of the officers over that of the defendant's in stating that "there is nothing in the record which seriously challenges the credibility" of Detective Forrester and Detective Cardelli. (JA 82) We must afford due weight to the factual inferences and credibility determinations made by the district court. *United States v. Caruthers*, 458 F.3d 459, 464 (6th Cir. 2006).

Viewing the district court's findings of fact in their totality, the officers "were aware of specific and articulable facts which gave rise to a reasonable suspicion" that Richardson was engaged in criminal activity. *Hardnett*, 804 F.2d at 356. The CI in the instant appeal told Detective Forrester that a man would deliver illegal narcotics to him at a particular time and location later that same day and would be driving a particular type of car. The officers subsequently observed Richardson arrive at that location in that model car and he pulled around the back of the hotel, just as the CI had predicted. *See Alabama v. White*, 496 U.S. 325, 332, 110 L.Ed.2d 301, 110 S.Ct. 2412 (1990) ("What was important was the caller's ability to predict respondent's *future behavior*, because it demonstrated inside information-- a special familiarity with respondent's affairs"). Upon approaching the Monte Carlo, the

officers detected a very strong odor of marijuana coming from the defendant's car, at which

point they had probable cause to search the car and arrest the defendant.

B.

Finally, we find that the arrest was clearly justified by the discovery of the drugs during the pat-down. Detective Cardelli testified that the defendant was handcuffed only after the drugs were found in his front pants pocket. (JA 153) Once the officers placed handcuffs on the defendant, they had proceeded past the bounds of a *Terry* stop and effectuated an arrest of Richardson that was supported by probable cause.

During a *Terry* stop, an officer may conduct a limited protective search for concealed weapons when he "is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others." *Adams v. Williams*, 407 U.S. 143, 146, 32 L.Ed.2d 612, 92 S.Ct. 1921 (1972) (internal quotation marks and citation omitted). When Detective Cardelli approached the defendant, he noticed that Richardson's front pockets had large bulges in them. Detective Cardelli testified that the object in the defendant's right front pocket "felt hard, and I do [sic] not know what it was;" and, based on his experience in law enforcement, the object "could have been" a weapon. He asked the defendant twice what was in the pocket and Richardson didn't answer. The officers had also been told by the CI that he felt like the defendant would be armed. Every other detail provided by the CI occurred just as the CI had predicted. Detective Cardelli, therefore, had justification for patting down the defendant to ensure the safety of the officers. *See United States v. Foster*, 376 F.3d 577, 586 n. 7 (6th Cir. 2004) ("[A]n officer is permitted to conduct 'a reasonable search for

weapons for [his or her] protection . . ., where he [or she] has reason to believe that he [or she] is dealing with an armed and dangerous individual.'").

Since Detective Cardelli discovered the drugs before he concluded that the defendant was not armed, it did not violate the Fourth Amendment for him to seize the drugs discovered during the pat-down. *See Minnesota v. Dickerson*, 508 U.S. 366, 375, 124 L.Ed.2d 334, 113 S.Ct. 2130 (1993) (holding that the "plain view" doctrine "has an obvious application by analogy to cases in which an officer discovers contraband through the sense of touch during an otherwise lawful search").

## III.

For the foregoing reasons, the district court's ruling to deny the motion to suppress is AFFIRMED.